**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-4746**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MICHAEL SMITH, JR., a/k/a Mikey, a/k/a Lil Mike, a/k/a Mik,

Defendant - Appellant.

**No. 16-4764**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MARK BAZEMORE, a/k/a Uncle Mark,

Defendant - Appellant.

**No. 16-4765**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

TIMOTHY HURTT, a/k/a Uncle Tim, a/k/a Tim,

               Defendant - Appellant.

_____

Appeals from the United States District Court for the District of Maryland, at Baltimore. James K. Bredar, Chief District Judge.  (1:14-cr-00479-JKB-8; 1:14-cr-00479-JKB-11; 1:14-cr-00479-JKB-17)

_____

Argued:  October 30, 2018                        Decided:  March 27, 2019

_____

Before NIEMEYER, THACKER, and RICHARDSON, Circuit Judges.

_____

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge Niemeyer and Judge Thacker concurred.

_____

**ARGUED:** Michael Daniel Montemarano, MICHAEL D. MONTEMARANO, PA, Ellicott City, Maryland; Charles Burnham, BURNHAM & GOROKHOV PLLC, Washington, D.C., for Appellants.  David Daniel Metcalf, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:** Harry D. McKnett, LAW OFFICE OF HARRY D. MCKNETT, LLC, Columbia, Maryland, for Appellant Michael Smith, Jr.  Stephen M. Schenning, Acting United States Attorney, James Wallner, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

RICHARDSON, Circuit Judge:

Defendants Mark Bazemore, Michael Smith, Jr., and Timothy Hurtt participated in the illegal activities of a Baltimore street and prison gang known as the Black Guerrilla Family. Their involvement in the gang's drug dealing and acts of violence led to their convictions. The Defendants seek to reverse those convictions for two main reasons. First, they argue the district court improperly handled the fears some jurors expressed to the court after learning of this gang's predilection for violence and retaliation. Second, they claim the district court should have excluded an FBI agent's expert testimony decoding intercepted calls. We reject their challenges.

## I.

### A. Factual Background

Bazemore, Smith, and Hurtt were high-ranking members of the Black Guerilla Family, a criminal gang founded in the 1960s in California's San Quentin State Prison. The gang moved across the country, establishing itself in Maryland's prison system before expanding to the streets of Baltimore.

The gang organized itself into subsets called "regimes" that controlled the drug trade in Maryland state prisons and in dozens of Baltimore neighborhoods. Each regime was overseen by a "bushman," often referred to as "Uncle" or "Unc." In leading a regime, the bushman collected dues, settled disputes, and enforced protocol by ordering

3

sanctions ranging from fines to death against members who broke the gang's many rules.[1]

Troubled by the gang's criminal activities, the FBI undertook a broad investigation into the Black Guerilla Family's Baltimore operations. They wiretapped the phone of the gang's city-wide commander, Timothy Michael Gray, along with dozens of phones used by other gang members (including Defendants Bazemore and Hurtt). The FBI's investigation exposed the gang's sprawling drug business, documenting forty Baltimore locations where the gang distributed heroin and cocaine. With these drug profits at stake, the gang often turned to violence to protect its territory.

Along with violently protecting their drug trade, the gang's leaders had a penchant for killing their subordinates that broke protocol. For instance, Bazemore ordered the murders of members George Nealy and Ronald Hall. Of all the gang's violence, the attempted murder of Hall bears most directly on this appeal. On March 10, 2014, Bazemore ordered gang member William "Boosie" Harrington to kill Hall for allegedly

---

[1] Black Guerilla Family members adhered to official bylaws and upon initiation swore to the following oath:

> Should ever I be untrue and forsake the chosen few, this oath shall kill me.
> Should ever I become lax in discipline at times of strife and neglect my brother, this oath shall kill me.
> If ever I sought to do harm or allow harm to come to my brothers, this oath shall kill me.
> If ever I refuse or deny to give assistance to [] or reject my brother, this oath shall kill me.
> If ever I fail the sworn secrecies of this oath, this oath shall kill me.

J.A. 839–40; *see* J.A. 670, 843.

lying to the gang's leadership. Shortly before the shooting, Bazemore and Harrington spoke twice by telephone. The first call took place at 3:50 PM when Harrington asked to confirm the order:

Bazemore: "Yo."
Harrington: "Hey, Unc, what's up baby?"
Bazemore: "What's good?"
Harrington: "Listen to me real carefully."
Bazemore: "Uh huh."
Harrington: "I'm around Lil Shorty, you heard me?"
Bazemore: "Yeah."
Harrington: "The one you always wanted me to holler at."
Bazemore: "Right."
Harrington: "I'm out Lakeland."
Bazemore: "Right."
Harrington: "Is that special light still good, good?"
. . .
Harrington: "I got him right here."
Bazemore: "Matter fact, don't worry about it, don't worry about it. I'm holler at you on the close up about that one."

S.J.A. 122. One minute later, Harrington again called Bazemore and said, "Unc I'm in his bushes. Like right now, it'd be easy and I'd be out of here, you feel me?" S.J.A. 124. Bazemore replied with the authorization: "Alright, so go ahead then. Go ahead and do it then." *Id.*

FBI Special Agent Mark James monitored these wiretapped conversations in real-time. Understanding Bazemore's order to kill, Agent James alerted local police that an act of violence was about to occur in South Baltimore's Lakeland neighborhood. Baltimore Police arrived at the scene to find Hall with gunshot wounds to his arms and torso. After he was rushed to the hospital, Hall survived.

5

Three weeks after shooting Hall, Harrington was arrested and detained by state authorities for attempted murder. In jail, Harrington faced violent retaliation from other incarcerated Black Guerilla Family members for shooting their fellow gang member, Hall. In hopes of avoiding attack, Harrington placed several calls from a jail telephone seeking to "get in touch with Uncle Mark" to prove he acted with Mark Bazemore's go-ahead. S.J.A. 067. When Harrington finally reached Bazemore, he passed the phone to a fellow inmate after telling Bazemore that "[t]his [is] another good soldier here that wanted to holler at you." J.A. 1013. Bazemore then confirmed to the other inmate that he authorized Harrington to shoot Hall: "What Boosie [Harrington] did to him came straight from the head. It came from me. I told him do that and he can do that." J.A. 1014.

## B. The Trial

The Defendants, along with 15 other members of the gang, faced federal charges for conspiring to participate in a racketeering enterprise (18 U.S.C. § 1962(d)) and for conspiring to distribute drugs (21 U.S.C. § 846).[2] Bazemore was also charged with attempted murder and conspiracy to commit murder in aid of racketeering (18 U.S.C. § 1959(a)(5)). And Bazemore and Hurtt were charged with conspiring to use a firearm in relation to the racketeering and drug conspiracies (18 U.S.C. § 924(o)). After their co-defendants all pleaded guilty, Bazemore, Smith, and Hurtt stood trial in May 2016.

---

[2] Harrington pleaded guilty to the racketeering conspiracy and, after stipulating to his involvement in the shooting of Hall as an act in furtherance of the conspiracy, received 151 months in prison.

Over the course of a month, the Government proved the racketeering, drug, attempted murder, and firearm offenses through three main sources of evidence. First, law enforcement officials (including Agent James) testified about their investigation. Second, seven cooperating gang members described the gang's organization and criminal activities. And third, recordings of wiretapped and jailhouse telephone calls confirmed the law enforcement and cooperator testimony.

The trial evidence highlighted the gang's violent nature. This caused anxiety for some members of the jury. On the third day, Juror No. 5 notified the court that she was afraid. In a sealed hearing, Juror No. 5 explained that she had revealed during jury selection her husband's exact employment location. In sharing that information at side-bar, Juror No. 5 had mistakenly assumed that the Defendants were unable to hear her. Having realized her mistake, she explained, "[i]f these people are the people that the [Government] contends, and if the jury comes back with a guilty verdict, [] it would be very easy if they had retaliation on their mind" to use the information shared to obtain her family's address. J.A. 1241. After Juror No. 5 voiced doubt that she could remain fair and impartial, the district court excused her.

The district court also asked Juror No. 5 whether she had discussed her fears with other jurors, and she replied that she had spoken with "a Jim, a Jimmy, and a Mike." J.A. 1246. Based on the possibility that her discussions might have contaminated the entire jury, the Defendants moved for a mistrial.

Rather than grant the requested mistrial, the district court devised two questions to ask each juror to probe for impartiality, bias, or contamination:

7

> Question 1: When we last spoke during the jury selection process, you told me that you believed that you could be a fair and impartial juror. Has anything occurred since we last spoke that would cause you to change your answer to that question?
>
> Question 2: Since you began to serve on the jury, has anything been said or overheard by you in the jury room that would affect your ability to be a fair and impartial juror?

J.A. 1254–55. In response, all but two jurors confirmed that they could remain fair and impartial.

The first juror who expressed apprehension about being fair was Juror No. 10. He explained that "the nature of the case" made him scared for himself and his family. The district court noted that "the juror became emotional and . . . was crying or nearly crying and struggling to control his emotions" during the questioning. J.A. 1292–95. Doubting that Juror No. 10 could be fair and impartial, the court excused him for cause.

The second juror voicing concern about her ability to remain impartial was Alternate Juror No. 4. Much like Juror No. 5, Alternate Juror No. 4 expressed concern because she now realized that the Defendants could hear the details she shared during jury selection. As a result, she explained that she feared being recognized by gang members on the streets of Baltimore. J.A. 1307. The district court then excused Alternate Juror No. 4 for cause.

After the three jurors were excused, twelve jurors and one alternate remained. The district court denied the Defendants' renewed request for a mistrial, finding that its questioning "did not detect any contamination or something untoward, rampant, or even running among the remaining jurors." J.A. 1318–19.

8

When the trial resumed, the Government called Gray, the head of the Baltimore gang. Gray testified at length about the gang's operations and explained several wiretapped calls coordinating its various illegal activities. As part of his testimony highlighting the gang's extensive reach throughout Maryland, Gray implicated Bazemore as the bushman who ordered Harrington to kill Hall. *See* J.A. 571–85 (expounding upon a call between Gray and Bazemore).

Having heard from Gray, the Government sought to use several recorded calls to confirm that Bazemore authorized Harrington to kill Hall. Most of the recorded conversations took place in code—an assortment of slang, nicknames, and substituted words meant to prevent an outside listener from deciphering their meaning. So the Government re-called Agent James to provide expert interpretations of the calls.[3] After Agent James was qualified as an expert in drug and gang terminology in Maryland, he explained the meanings of several coded terms.

Agent James's explanations began with the call from March 10, 2014, at 3:50 PM, in which Harrington asked Bazemore if the "special light" remained good. Agent James described that the term "Unc" meant a bushman in the Black Guerrilla Family. Before Agent James could give his expert opinion on the meaning of "special light," the Defendants objected, expecting that the testimony would conflate expert interpretation with factual analysis. The district court permitted Agent James to opine that he

---

[3] Agent James testified earlier in the trial as a fact witness to describe the FBI investigation and its use of wiretaps, controlled drug buys, and other investigatory techniques.

interpreted "special light" as a "green light," which is an "authorization used by gang members . . . to kill another person." J.A. 971. Agent James testified that he based his interpretation on the context, other incidents in the investigation, and debriefings from other gang investigations he had done. Agent James was not permitted to interpret Bazemore's next statement—"don't worry about it." The Government then played, without interpretation, the very next call in which Bazemore gave Harrington the "go ahead" to "do it."

After that call was played, Agent James described to the jury the steps he took to alert the Baltimore Police. The district court permitted this limited factual testimony over the Defendants' objection to what they called an improper "blurring of lines" between expert and factual testimony.[4]

Once Agent James explained how Baltimore Police received the information, the Government called Detective David Bomenka, who had responded to the scene. Detective Bomenka testified that on the afternoon of March 10, 2014, he arrived in Lakeland to find Hall shot and shell casings on the ground.

Agent James then re-took the stand to continue in his role as expert witness. He interpreted several of Harrington's jail calls with other gang members, including

---

[4] Throughout the trial, the district court worked to maintain clarity and avoid conflating expert and lay testimony, admonishing the Government "to be very careful in your questioning to make it crystal clear that you are asking for the agent's interpretation of the language … and not [permit the agent] to stray into offering opinions more broadly about what the plotters and schemers are up to." J.A. 1004; *see also* J.A. 965D ("I want a really crisp line drawn between his testimony as an expert witness and his testimony as a fact witness.").

Bazemore, about the authorization to shoot Hall. At the end of Agent James's direct testimony, the district court gave to the jury a long cautionary instruction emphasizing the importance of separating fact testimony from expert opinions.[5] The Defendants declined to cross-examine Agent James.

---

[5] The district court's cautionary instruction read:

Ladies and gentlemen, Special Agent James has testified on two separate occasions during this trial. During his initial testimony, Special Agent James provided fact testimony, but as I instructed you during his second time on the stand today, I instructed you that Special Agent James today was permitted to give opinion testimony regarding drug and gang terminology that may have been present in the phone calls that you've just heard. I caution you that during his second time on the stand, Special Agent James was providing only his opinion as an expert as to the substance of those calls and phrases. The fact that he also possesses factual information regarding this case should not be taken into account by you as you determine what, if any, weight to decide to give Special Agent James's expert opinions. It's for you to decide how much weight to give all of the evidence, including fact and opinion testimony. Special Agent James's testimony as a fact or expert witness is entitled to no greater or lesser weight simply because he is an expert in one context and was previously qualified to do so.

You've just heard extensive testimony from Agent James. Agent James was called and qualified and permitted to testify as an expert witness. His field of expertise was drug and gang terminology in Maryland. Within that zone of expertise, Agent James was permitted to offer you his opinions. Specifically, he was allowed to tell you his interpretations based on his training and experience as to the meaning of statements made by alleged members of the Black Guerilla Family during telephone calls. You are permitted to give Agent James's expert opinions on the meaning of drug and gang terminology, such weight as you may think they deserve.

Ladies and gentlemen, I draw a distinction between the opinion testimony about drug and gang terminology, and any more traditional fact testimony that Agent James may have given earlier in this trial. During his previous

(Continued)

11

The jury convicted the Defendants on all charges. The jury specifically found Bazemore and Hurtt responsible for multiple acts of first-degree murder, attempted murder, conspiracy to commit murder, extortion, witness retaliation, and drug distribution as part of the racketeering conspiracy. S.J.A. 49, 53. The jury found Smith responsible for extortion and drug distribution under the racketeering conspiracy. S.J.A. 56. The district court sentenced Bazemore to life, Hurtt to 324 months, and Smith to 210 months.

## II.

The Defendants challenge their convictions on two main grounds. First, they claim that the district court improperly handled jurors' fears for their safety. Second, the Defendants argue that the district court erred by allowing portions of Agent James's expert testimony. We reject each argument in turn.

### A. Juror Bias

The Defendants fault the district court for how it addressed the jurors' fears of gang retaliation. They claim the district court's questioning of the jurors was inadequate

---

testimony he was not testifying as an expert, and he was not permitted to offer expert opinions on the subjects then presented to him.

If ever during this trial you thought you heard Agent James offer an expert opinion on a subject outside the scope of drug and gang terminology in Maryland, then I instruct you to disregard that testimony. Agent James's expert opinions are only allowed as to drug and gang terminology. On all other topics on which he might have testified, he's a fact witness and not authorized to present expert opinions.

J.A. 1023–25.

for failing to ask each juror expressly about Juror No. 5's fears and discussions with other jurors. Besides this process concern, the Defendants also object to the court's ultimate refusal to grant a mistrial.

The Sixth Amendment guarantees a criminal defendant the right to a trial "by an impartial jury." U.S. CONST. amend. VI. This right requires a trial judge to remain "'ever watchful to prevent prejudicial occurrences,' and [he] therefore must conduct *voir dire* in a manner that adequately identifies unqualified or potentially biased jurors." *Gardner v. Ozmint*, 511 F.3d 420, 424 (4th Cir. 2007) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).

When a serious, non-speculative question of juror impartiality arises during trial, the district court must determine whether the affected jurors remain fair and impartial. *See United States v. Thompson*, 744 F.2d 1065, 1068 (4th Cir. 1984); *Neal v. United States*, 22 F.2d 52, 53 (4th Cir. 1927). As the trial judge is in the best position to make this determination, the inquiry is committed to his discretion, including ample leeway to formulate the questions to be asked. *United States v. Barber*, 80 F.3d 964, 967 (4th Cir. 1996) (en banc).

After learning of Juror No. 5's fears, the district judge here questioned each juror individually. That required balancing the need to detect bias against the concern that inartful questioning could itself generate bias. As the trial judge observed, detailed or fact-specific questions could "become the toxin by which the [jurors'] minds are poisoned and the fears are generated." J.A. 1256. He thus asked about bias directly, without explicitly discussing Juror No. 5 or any fears of violent retaliation. In evaluating

13

their responses, he considered the jurors' reactions and, where necessary, followed up. *See, e.g.*, J.A. 1267–74 (asking more questions and discussing the juror's demeanor). District courts are encouraged to take this direct approach to detect bias in jurors. *See, e.g.*, *United States v. Caro*, 597 F.3d 608, 615 (4th Cir. 2010). This trial judge made reasoned judgments in walking the line between detecting bias and creating bias. And we are not here to micro-manage those considered choices.

Just as the trial judge has latitude in framing the inquiry, so too does he have broad discretion in evaluating the significance of potential juror bias. *See Arizona v. Washington*, 434 U.S. 497, 513–14 (1978) (discussing the "great deference" owed to a trial judge's decision to declare a mistrial based on possible juror bias). This trial judge made appropriate inquiries into juror bias. He then excused those jurors who, by their answers or demeanor, suggested they could not be fair and impartial. Left only with jurors who had assured him of their continued impartiality, the trial judge acted well within his discretion in denying the requested mistrial. *See United States v. Jones*, 716 F.3d 851, 857 (4th Cir. 2013) (noting that the court may rely on a juror's assurance of continued impartiality if the court finds it credible).

### B.     Agent James's Expert Testimony

The Defendants next argue that the district court abused its discretion in admitting portions of Agent James's expert testimony. *See United States v. Wilson*, 484 F.3d 267, 273 (4th Cir. 2007). The Defendants claim first that his experience-based linguistic opinions were not the product of a reliable methodology for interpreting coded jargon. Second, they argue that Agent James impermissibly blended fact and expert testimony,

14

creating jury confusion and unfair prejudice. Third, they allege that Agent James served as a mere conduit for testimonial hearsay in violation of the Confrontation Clause. We reject each argument and also find harmless any instance in which Agent James may have strayed outside the bounds of proper testimony.

### 1.    Qualification and Methodology

Agent James used a reliable methodology in forming his expert opinions. Federal Rule of Evidence 702 permits expert testimony from "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" where the "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" so long as the expert's opinion is "based on sufficient facts or data," is "the product of reliable principles and methods," and the expert "has reliably applied the principles and methods to the facts."

Under Rule 702, a district court must ensure that the expert is qualified and that the expert's testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). In performing this gatekeeping role, a district court "is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No II)*, 892 F.3d 624, 631 (4th Cir. 2018) (citation and quotation marks omitted).

We begin by recognizing that Agent James's experience appropriately qualified him to serve as an expert. Agent James was a twelve-year veteran of the FBI with substantial experience in drug and gang investigations (conducting controlled buys,

15

interviewing drug dealers and gang members, using gang members as confidential sources, listening to thousands of recorded conversations, and so forth). Without objection, the court qualified Agent James as an expert in drug and gang terminology in Maryland.

Having found Agent James qualified, the district court explained that he applied a methodology based on his extensive experience to understand the conversations. J.A. 965G–H. Courts have consistently approved of law enforcement agents like Agent James offering expert interpretations of gang and drug communications based on their experience. *United States v. Galloway*, 749 F.3d 238, 245 (4th Cir. 2014) (accepting agents' "*method* of applying their extensive experience to analyze the meaning of the [drug-related] conversations through context"); *see also United States v. Palacios*, 677 F.3d 234, 242 (4th Cir. 2012); *United States v. Baptiste*, 596 F.3d 214, 222–23 (4th Cir. 2010); *Wilson,* 484 F.3d at 274–75. The district court here correctly approved of Agent James's methodology for interpreting gang and drug calls based on his experience.

The conclusion that Agent James employed a sound methodology is only one step in our analysis. We must also decide whether he reliably applied it to the facts in forming his expert opinions. Fed. R. Evid. 702(d). As the district court rightly concluded, Agent James reliably applied his methodology. *See Wilson*, 484 F.3d at 274 (noting the district court's "broad latitude" in determining whether the expert's methodology is reliable). For example, in the first call on March 10, 2014, between Bazemore and Harrington, Agent James interpreted the phrase "special light" as "a green light," which he described

as an authorization used by gang members to kill another person. J.A. 971.[6] He based that interpretation on his experience with other investigations as well as the context of this investigation.

In the same manner, Agent James applied his experience to interpret various other coded terms like "Unc," "rolled out of JI," "burnt," and "checking in." *See, e.g.*, J.A. 977 (explaining that "JI" is a housing unit in the city jail and that "[g]etting rolled out of JI is getting moved out of that section of the city jail"). In doing so, Agent James provided a basis for his interpretation, rendering it both susceptible to scrutiny by the district court and to being challenged on cross examination by the Defendants.

Agent James did not always point to a specific experience that informed each expert opinion. This is unsurprising. Agent James based his interpretations on years of investigatory experience and exposure to thousands of gang and drug conversations. The application of this experience to analyze the meaning of certain terms does not lend itself to a direct correlation between one experience and one opinion. This is much like how foreign-language experts, such as Spanish interpreters, apply their training and experience to analyze the meaning of conversations. Those experts do not translate based on any one piece of information or learned treatise (like a dictionary) but analyze and synthesize an array of information learned over years.

---

[6] The Defendants vacillate between conceding that Agent James could interpret "special light," *see* Reply at 11; J.A. 967, and challenging even this interpretation of "special light," *see* Reply at 13. Regardless, we find the court properly admitted this important testimony.

Whether one considers Agent James more like a foreign-language interpreter or an anthropologist who studies a group by educating himself and conducting fieldwork, *see United States v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008) (analogizing a gang expert to an anthropologist), his expertise does not derive from any singular piece of information. As it would be impossible to ask this expert to lay such a precise foundation for an opinion when his expertise was gained over extended, repeated exposure, we cannot say that the district court abused its discretion in concluding that Agent James reliably applied his methodology.

### 2. Blending Facts and Expert Opinions

The Defendants also argue that Agent James improperly blended expertise with factual testimony. To be sure, while serving as an expert, Agent James did at times testify to facts he learned as a participant in the investigation. This dual-role testimony—like all testimony—requires a determination of whether "its probative value is substantially outweighed" by the risk of unfair prejudice or jury confusion. Fed. R. Evid. 403. To maintain this Rule 403 balance, district courts must be vigilant to avoid the danger of confusing the jury when a case agent testifies as an expert. *See Wilson*, 484 F.3d at 278 n.5.

That is why we have directed district courts to take steps to provide the jury clarity about the dual roles. *United States v. Baptiste*, 596 F.3d 214, 224 (4th Cir. 2010). As examples of safeguards the district court may employ, we have suggested "requiring the witness to testify at different times, in each capacity; giving a cautionary instruction to the jury regarding the basis of the testimony; allowing for cross-examination by defense

18

counsel; establishing a proper foundation for the expertise; or having counsel ground the question in either fact or expertise while asking the question." *United States v. Garcia*, 752 F.3d 382, 392 (4th Cir. 2014). None of the options on this list are necessary or per se sufficient. *Id.* (noting that precautions may be insufficient to mitigate the risk of jury confusion and prejudice resulting from a given agent's expert and fact testimony). The ultimate question is whether, considering the safeguards used, the testimony's "probative value is substantially outweighed" by the risk of jury confusion or unfair prejudice. Fed. R. Evid. 403.

Before considering the district court's implemented safeguards, it bears mentioning that certain instances of Agent James's fact testimony were not only permissible but indeed necessary to provide context for his interpretations of the intercepted calls. An expert's methodology cannot be applied in a factual vacuum. Thus, an expert in code or language must consider the context surrounding the language in determining the appropriate interpretation. *See, e.g.*, *Galloway*, 749 F.3d at 245 (approving analysis of the "context" of communications); *Wilson*, 484 F.3d at 275–76 (approving consideration of the "situation" surrounding a call). As anyone teaching a child to read can attest, context often provides invaluable clues to understanding the meaning of words. *Cf.* PEGGY PARISH, AMELIA BEDELIA (1963) (humorous tale of a maid who misinterprets various commands; for example, when asked to "draw the drapes," she sketches a picture of them); FRED GWYNNE, THE KING WHO RAINED (1970) (illustrations of a bewildered young girl who gets tripped up over homophones; for

example, "a king who rained for forty years" shown as a king floating in the sky as a rain cloud).

This context includes the date and time of the intercepted call along with the sequence of calls:  for example, the fact that certain calls occurred on the same day and one immediately followed the other.  Indeed, given the obvious need for this type of context, the Defendants necessarily conceded that Agent James could provide this factual context during his expert testimony.[7]

But appropriate factual context is not limited to a call's date and time.  It includes other contextual information such as the identity of the callers.  And along with date, time, and participants, the context of a conversation also includes the surrounding circumstances, like whether a participant in the call was incarcerated or whether police found a man shot shortly after a call seemingly authorized a shooting.  Far from generating confusion for the jury, including this factual context *reduced* the risk of jury confusion by providing a more coherent narrative of the investigation and a proper framework for Agent James's expert opinions.

---

[7] While the use of context *as part of* the expert's analysis is permissible, an agent expert may not rely exclusively on the surrounding events to provide an expert interpretation of the call.  *See Garcia*, 752 F.3d at 393 (criticizing an agent's testimony that "a hundred forty five point" meant 145 grams of heroin apparently based solely on a later seizure of 145 grams of heroin; the agent applied no expertise and, in any event, the words did not require decoding).

The Defendants suggest that the factual context surrounding the calls must come solely from independent evidence.[8] In other words, the Defendants want to preclude any context coming from Agent James's own factual observations. This novel suggestion—that an expert may only consider "independently verified" evidence—can be rejected by reading the plain text of Rule 703, which provides that an "expert may base an opinion on facts or data in the case that the expert has been made aware of or *personally observed*." Fed. R. Evid. 703 (emphasis added).[9]

Balancing the need for factual context for Agent James's opinions and the risk in blending expert and factual testimony, the Government and the district court here took effective steps to mitigate any jury confusion or unfair prejudice to the Defendants. *Baptiste*, 596 F.3d at 224. Despite the broad scope of the investigation and charges, the Government focused Agent James's expert testimony on calls related to a single incident:

---

[8] Some caller identifications used by Agent James stemmed from evidence otherwise admitted at trial (*e.g.*, a co-conspirator identified the phone number or voice), but others followed from Agent James's own knowledge as a percipient witness. Similarly, circumstances surrounding the context of a call sometimes came from independently admitted evidence and sometimes from his own factual observations.

[9] The Defendants are also incorrect in contending that in forming his opinions, Agent James was limited to relying on *admissible* evidence. An expert may rely on inadmissible evidence, including hearsay. *See United States v. Leeson*, 453 F.3d 631, 637 (4th Cir. 2006); *see also* Fed. R. Evid. 703. In particular, we have repeatedly held that an agent may rely on testimonial hearsay in forming his expert opinions. *Palacios*, 677 F.3d at 242–43; *see also United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009) (observing that the Confrontation Clause "forbids the introduction of testimonial hearsay as evidence in itself, but it in no way prevents expert witnesses from offering their independent judgments merely because those judgments were in some part informed by their exposure to otherwise inadmissible evidence").

the attempted murder of Hall. The Government also agreed to call Agent James to the witness stand twice, first as a percipient witness and later as a qualified expert. By limiting the breadth of the expert testimony and separating in time his fact and expert testimony, the Government cabined any potential confusion or unfair prejudice. *See Wilson*, 484 F.3d at 278 n.5.

The district court further limited the scope of Agent James's expert opinions about the calls related to the shooting by admonishing the Government to avoid "stray[ing] into offering opinions more broadly about what the plotters and schemers [were] up to," J.A. 1004, and sustaining objections when the Government approached that line, *see* J.A. 972, 996–97. In doing so, the court limited any unfair prejudice that arose from Agent James's knowledge of the investigation. The court also provided the Defendants an opportunity to cross-examine Agent James, which they could have used to probe his expert opinions. Yet they declined that opportunity. Finally, the district court provided a thorough instruction to the jury on the importance of distinguishing fact testimony from expert opinions, insulating it from the risk of confusion. *See Baptiste*, 596 F.3d at 224; *United States v. Farmer*, 543 F.3d 363, 370–71 (7th Cir. 2008). In sum, based on the circumstances here, the district court properly performed its gatekeeping role and avoided having unfair prejudice and jury confusion substantially outweigh the probative value of the narrow expert testimony offered. *See* Fed. R. Evid. 403.

### 3. Confrontation Clause

Despite the district court's efforts to avoid juror confusion and unfair prejudice, Agent James's testimony would have been improper if it served simply as a conduit for

22

testimonial hearsay. *Garcia*, 752 F.3d at 394–95; *Johnson*, 587 F.3d at 635. A direct transmission of testimonial hearsay to the jury—as opposed to reliance on testimonial hearsay as part of proper expert opinion—would violate the Confrontation Clause. *Johnson*, 587 F.3d at 634–36 (discussing *Crawford v. Washington*, 541 U.S. 36 (2004)). To determine whether an expert's testimony raises a Confrontation Clause issue, we look for indicia that the expert is giving an independent judgment and not "merely acting as a transmitter for testimonial hearsay." *Id.*

The Defendants claim that Agent James's expert testimony was improper under our decision in *Garcia*. In that drug-conspiracy case, the Government's evidence consisted primarily of law enforcement surveillance and recordings of wiretapped calls. *Garcia*, 752 F.3d at 385–86. To interpret the calls, the Government called an FBI agent to opine on the meaning of the conversations, many of which were in Spanish. In doing so, the agent admitted to debriefing three co-conspirators during the investigation to confirm her understanding of the code. *Id.* at 394. Garcia claimed the agent's interpretations impermissibly transmitted that testimonial hearsay rather than providing independent judgment about the meaning of coded terms. Given the apparent reliance on co-conspirator debriefings, we found that "it was incumbent upon the Government to demonstrate that [the agent] was not merely channeling information and statements by non-testifying participants in the conspiracy into the trial record." *Id.* After reviewing the record, we concluded that it was "devoid of evidence" that the agent used the debriefings only to confirm her understandings rather than to serve as the sole basis of those opinions. *Id.* at 395. We therefore found error in admitting the testimony.

23

But Agent James's testimony materially differs from that in *Garcia*. Agent James applied his own judgment to interpret the conversations in question; he was not simply relaying the conspirators' interpretations. Nothing from Agent James' testimony suggests he relied at all on co-conspirator interviews. In contrast, the record reveals that his interpretation of the code between Bazemore and Harrington turned on his own expertise given that, minutes after the calls on March 10, 2014, he alerted local authorities. This timing confirms that Agent James exercised his judgment independent of any later debriefings. Not surprisingly, later developments—such as the discovery of a wounded Ronald Hall and jailhouse calls about the authorization to shoot Hall— confirmed his own interpretations. These are all indicia that the interpretations were not regurgitations of inadmissible testimonial hearsay. There were no Confrontation Clause problems with Agent James's testimony.

### 4. Harmless Error

Even if some of Agent James's testimony went beyond the plainly permissible, that limited testimony would be harmless. *See United States v. White*, 810 F.3d 212, 228 (4th Cir. 2016) ("Ultimately, the question is whether we can say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the jurors' judgment was not substantially swayed by the error.'" (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

To begin with, Agent James's expert opinions applied only to calls establishing Bazemore's involvement in the attempted murder of Hall. So any error would not affect

the convictions of Smith and Hurtt. But even for Bazemore, we find harmless any improper opinion testimony from Agent James.

At times, Agent James's testimony contained interpretations of conversations between gang members without code. For example, Agent James interpreted "[a]nd they're trying to do something to Shorty for something he did" as "[h]e's saying that [the gang] is trying to do something to Mr. Harrington for something Mr. Harrington did." J.A. 989. Agent James also interpreted some ambiguous words, including determining that the word "yo" had a few different meanings.[10] In doing so, Agent James purported to offer expert interpretations but actually provided explanations based on his knowledge of this specific investigation. While lay opinion testimony may be combined with expert opinion testimony, doing so generally requires a more substantial foundation to distinguish between lay opinion and expert opinion.[11]

---

[10] Agent James gave several interpretations of the flexible pronoun "yo." For one particular intercepted call, Agent James explained that "the yo" referred to the shooting of Hall; "yo told me" referred to Bazemore; "that yo" referred to Hall himself; and "holler at yo" referred to Bazemore. *See* J.A. 981 ("I already talked -- talked to him about the yo -- yo told me you not -- that yo not right point blank. He -- he -- he gave you all the oaths, okay, so anybody got a problem with it, holler at yo."). At other times, Agent James also interpreted "yo" to refer to shooting Hall. J.A. 1007. These meanings are not inherently inconsistent given the elasticity of the indefinite "yo." Even so, these interpretations do appear to assert information learned as the case agent under the guise of expert opinion. *See supra* n.7 (distinguishing between the proper use of context to inform an expert opinion from the improper use of personal knowledge as the sole basis for the opinion); *Garcia*, 752 F.3d at 393. Context may help form the basis for an expert opinion, but context must not be mistaken for expertise itself.

[11] Vigilantly safeguarding against jury confusion and unfair prejudice does not require a blanket prohibition against an expert witness also offering lay opinions. *See, e.g.*, *United States v. Freeman*, 498 F.3d 893, 904 (9th Cir. 2007) (permitting an agent to (Continued)

25

In any event, we need not determine which portions of this type of testimony were in error because we find that they would have been harmless. *See Wilson*, 484 F.3d at 278 (finding harmless any error in admitting portions of an agent's expert testimony when the "overwhelming majority" of the "testimony was properly admitted"). This was, after all, not a close case.

The jury heard considerable evidence that Bazemore ordered the attempted murder of Hall, leading us to conclude that any oversteps in Agent James's testimony did not substantially sway the jury. That evidence includes (1) the first call on March 10, 2014, which Agent James properly interpreted as seeking authorization to kill; (2) the second call on March 10, 2014, in which Bazemore instructed Harrington to "[g]o ahead and do it," played at trial without interpretation; (3) the testimony of Detective Bomenka, who discussed finding a wounded Hall in Lakeland shortly after Agent James alerted Baltimore Police; (4) the testimony of Bazemore's co-conspirator Gray, who implicated Bazemore as having ordered Harrington to shoot Hall; and (5) the jailhouse calls

---

offer both expert and lay opinion testimony and stating that "the use of case agents as both expert and lay witnesses is not so inherently suspect that it should be categorically prohibited"). Indeed, "[t]estimony of this kind may save time and expense, and will not necessarily result in juror confusion, provided that the district court engages in vigilant gatekeeping." *Id.*

We have yet to address directly how a court should manage an expert offering both expert interpretation of coded conversations and lay opinions of ambiguous or vague statements. *See id.* at 902. The district court here largely kept out Agent James's lay opinions and we leave for another day the best manner for district courts to safeguard against the potential dangers from dual-opinion testimony.

discussing the authorization.  Taken together, this evidence paints a strong evidentiary picture that Bazemore authorized Harrington to shoot Hall.[12]

\*          \*          \*

After a long trial, the jury convicted the Defendants based on voluminous evidence of participating in a broad conspiracy that involved widespread drug dealing and acts of violence.  Throughout, the district court made every effort to afford the Defendants a fair trial.  The Defendants' challenges to their convictions do not call into question the fairness of the proceeding.

For the reasons given, the district court's judgment as to each Defendant is

*AFFIRMED.*

---

[12] Two additional claims need not detain us long.  First, Hurtt argues that a passing reference by a Government witness to Hurtt being previously "locked up" required a mistrial.  This singular stray reference to Hurtt's prior incarceration did not amount to prejudicial testimony requiring a mistrial.  *See United States v. Hayden*, 85 F.3d 153, 158 (4th Cir. 1996).  Second, Bazemore argues that his sentence was substantively unreasonable, but he fails to rebut the presumption that his within-Guidelines sentence was reasonable considering the factors set forth in 18 U.S.C. § 3553(a).  *See United States v. Louthian*, 756 F.3d 295, 306 (4th Cir. 2014).  We find the district court did not abuse its discretion in either denying Hurtt's requested mistrial or sentencing Bazemore to life in prison.