**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 21-4487**

UNITED STATES OF AMERICA,

> Plaintiff – Appellee,

v.

GERALD THOMAS JOHNSON, a/k/a Geezy, a/k/a Gzy Tha Prince,

> Defendant – Appellant.

**No. 21-4488**

UNITED STATES OF AMERICA,

> Plaintiff – Appellee,

v.

KENNETH JONES, a/k/a K-Slay, a/k/a Slay,

> Defendant – Appellant.

No. 21-4489

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

MARQUISE MCCANTS, a/k/a Digga,

        Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. James K. Bredar, Chief District Judge. (1:16−cr−00363−JKB−1; 1:16-cr-00363-JKB-5; 1:16−cr−00363−JKB−9)

Argued: October 27, 2022               Decided: December 9, 2022

Before WILKINSON and HEYTENS, Circuit Judges, and Roderick C. YOUNG, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by unpublished opinion. Judge Wilkinson wrote the opinion, in which Judge Heytens and Judge Young joined.

**ARGUED:** Paul Francis Enzinna, ELLERMAN ENZINNA, PLLC, Washington, D.C., for Appellants. Peter Jeffrey Martinez, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Alan R.L. Bussard, LAW OFFICE OF ALAN R.L. BUSSARD, Towson, Maryland, for Appellant Kenneth Jones. Marc Gregory Hall, LAW OFFICE OF MARC G. HALL, P.C., Greenbelt, Maryland, for Appellant Marquise McCants. Erek L. Barron, United States Attorney, Christina A. Hoffman, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

2

WILKINSON, Circuit Judge:

Gerald Johnson, Kenneth Jones, and Marquise McCants were convicted in 2018 for crimes related to their involvement in the Black Guerilla Family's Greenmount Avenue Regime, a gang notorious for murdering anyone who cooperates with law enforcement. On appeal, this court vacated and remanded with instructions for the district court to conduct a *Remmer* hearing to determine whether a juror's report that people affiliated with the defendants photographed him at trial undermined the jury's impartiality. On remand, the district court conducted a *Remmer* hearing and concluded that there was no reasonable possibility that the incident affected the jury's impartiality. The defendants appeal again, arguing that the district court violated Federal Rule of Evidence 606(b) when it relied on the jurors' testimony about the effect the incident had on them. But because the district court properly conducted the *Remmer* hearing pursuant to our mandate, and because any error would have been harmless, we affirm.

I.

Appellants Gerald Johnson, Kenneth Jones, and Marquise McCants were members of the Black Guerilla Family's Greenmount Avenue Regime, a violent narcotics-trafficking gang based in Baltimore. Between 2005 and 2017, appellants were involved in murders, robberies, drug trafficking, and other crimes in connection with their membership in the gang. They were charged with numerous federal offenses, including conspiracy to participate in a racketeering enterprise and conspiracy to distribute and possess with intent to distribute heroin, cocaine, and other controlled substances. Johnson also was charged with murder in aid of racketeering, conspiracy to commit the same, and additional drug

3

and ammunition offenses. *United States v. Johnson* ("*Johnson I*"), 954 F.3d 174, 176 (4th Cir. 2020). McCants also was charged with being a felon in possession of a firearm.

The appellants' jury trial lasted ten weeks and included more than 50 witnesses and 500 exhibits. Multiple witnesses, including gang members who had been personally involved in the appellants' criminal activities, testified to the appellants' gang membership and crimes. The jury convicted appellants on all counts.

This appeal concerns an incident that occurred on the nineteenth day of trial, on January 9, 2018. A juror—Juror No. 4—reported to a court security officer, in front of all the other jurors, that persons affiliated with the appellants had attempted to photograph the jurors as they left the jury room and entered a public hallway. The district court directed court staff to interview the jurors. Those interviews revealed that Juror No. 4 had reported seeing two women holding their phones at chest height, pointing them outward, and told several other jurors that "they're taking pictures of us." *Johnson I*, 954 F.3d at 178. Three other jurors recounted seeing people holding their phones in the hallway, but none believed those individuals were taking pictures. *Id.*

The court concluded there was no "corroboration for Juror No. 4's concerns or observations in the statements of any other jurors, any court security officers, or any other information that has been brought to the Court's attention. . . . [T]here is not evidence before the Court at this point, [that] any actual photographing . . . was going on." J.A. 1228. But because the court was "concerned" that Juror No. 4 "may well believe" that "something was going on . . . that could influence his experience here and consequently his judgment with respect to the case," the court dismissed him. *Id.* at 1229.

4

The U.S. Marshal's Service investigated the incident after the court adjourned for the day. Deputy marshals searched the phone of an individual that Juror No. 4 observed and found no photos of the jurors. The marshals reported their findings to the court the next day, and the court found that the investigation "further supports the Court's conclusion" that it had handled the incident properly. *Id.* at 1235. The court then provided the remaining jurors with the following curative statement:

> Yesterday afternoon it was reported to the Court that one or more jurors had a concern that perhaps someone outside of the jury room, in the courtroom vestibule [ ] or courtroom hallway[,] had photographed or otherwise captured the images of jurors. This matter was investigated after that report was received. The investigation included the examination of a smart phone[/]camera type device in the possession of a relevant individual. That investigation revealed that there were no images, films, videos of the sort that I have referenced on that telephone.

*Id.* at 1237–38.

After the verdict was delivered and their motion for a new trial was denied, appellants appealed on the ground that their Sixth Amendment right to a fair trial was violated because the district court failed to conduct a *Remmer* hearing to determine whether the alleged photographing incident resulted in juror bias. *See Remmer v. United States*, 347 U.S. 227 (1954); *Johnson I*, 954 F.3d at 179.

This court granted relief. We held that because the alleged photographing incident was a "non-innocuous external influence" that could "reasonably draw into question the ability of the jurors to remain impartial," *Remmer* entitled the appellants "(1) to a rebuttable presumption that the external influence prejudiced the jury's ability to remain impartial; and (2) to an evidentiary hearing to determine what actually transpired and whether the

5

challenged contact was harmless." *Johnson I*, 954 F.3d at 179–80 (quotation marks omitted). Given that *Remmer* was triggered, the district court's response was procedurally flawed because it did not "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, *in a hearing with all interested parties permitted to participate*." *Id.* at 180 (quoting *Remmer*, 347 U.S. at 229–30 (emphasis added in *Johnson I*)). It was also substantively flawed because it "failed to consider the *effect* on the jurors of the perceived external contact": "the question whether a photograph was taken was not dispositive of the prejudice inquiry, as one or more jurors may have *felt* intimidated regardless." *Id.* at 181. Therefore, we remanded for the district court to conduct "an evidentiary hearing under *Remmer* to determine whether all the jurors remained impartial throughout the case, as guaranteed by the Sixth Amendment." *Id.* at 182–83.

On remand, the district court conducted a *Remmer* hearing over three days in May 2021, during which it interviewed every juror and alternate as well as the deputy marshals and court security officers who were involved in the incident. The court heard testimony from the jurors "regarding their memory of the trial, the events of January 9, 2018, and the impact those events had on their ability to continue to be fair and impartial jurors." *United States v. Johnson*, No. CR JKB-16-363, 2021 WL 4037708, at *5 (D. Md. Sept. 3, 2021).

Before questioning each juror, the court instructed: "As you respond to my questions, please be careful not to tell us about the jury's deliberations on guilt or innocence, or about how you reached your verdict." J.A. 2296–97. Then, after asking about each juror's recollection of the events, the court instructed that "[i]n responding to the next questions," the juror should not mention "anything about what happened, what was said,

6

what you thought or what you felt after deliberations began." *Id.* at 2298. The "answers to these questions should be limited to events that occurred and things that you thought or felt before you began deliberations." *Id*. The court proceeded to ask whether each juror "fe[lt] intimidated by anything that had occurred" after the "discussion about possible picture taking on January 9 and 10." *Id*. Finally, the court asked whether each juror was "able to remain an impartial juror" and "keep an open mind as the trial continued" after the incident. *Id.* at 2299.

After the *Remmer* hearing, the district court found that "(1) no photos of the jury were in fact taken, and (2) Juror No. 4's report produced minimal concerns and conversations among the remaining jurors." *Johnson*, 2021 WL 4037708, at *30. "[E]very deliberating juror believed that they were subjectively able to remain impartial and open minded after the events of January 9, 2018" and these "subjective assurances were bolstered by several objective indicia that Juror No. 4's report was a fleeting distraction in the face of overwhelming evidence." *Id*. Given these findings, the court concluded that the government met its burden of rebutting the presumption of prejudice by showing that there was no reasonable possibility that the jury was influenced by the incident. *Id*. Accordingly, it granted the government's motion to reinstate the guilty verdicts. *Id.* at *31.

The appellants timely appealed. Their chief argument is that the district court transgressed Federal Rule of Evidence 606(b) when it relied on juror testimony concerning the subjective effect of the alleged photo incident on their mental processes. Br. of Appellants 31–32. In their view, the court should have applied an objective test based on the incident's nature and probable effect on a hypothetical average jury. *Id.* at 31–35.

7

II.

We review a district court's conclusions regarding juror impartiality when alleged third-party contacts are involved under a "somewhat narrowed[,] modified abuse of discretion standard that grants us more latitude to review the trial court's conclusion in this context than in other situations." *United States v. Basham*, 561 F.3d 302, 319 (4th Cir. 2009) (quotation marks omitted). The trial judge has "broad discretion in evaluating the significance of potential juror bias" and "ample leeway to formulate the questions to be asked." *United States v. Smith*, 919 F.3d 825, 834–35 (4th Cir. 2019).

The district court did not abuse its discretion when it relied on the jurors' testimony about the effect that the alleged photographing incident had on them. The court simply followed this court's mandate in *Johnson I*. It did not transgress Federal Rule of Evidence 606(b) because it explicitly instructed the jurors not to discuss how they reached their verdict and asked only about their ability to remain impartial during trial.

A.

To begin, the district court did not abuse its discretion because it conducted the *Remmer* hearing in accordance with this court's mandate. When this court "remands for further proceedings, a district court must . . . implement both the letter and the spirit of the . . . mandate, taking into account [the court's] opinion and the circumstances it embraces." *United States v. Bell*, 5 F.3d 64, 66–67 (4th Cir. 1993) (quotation marks omitted). In other words, the district court had no choice but to follow this court's mandate in *Johnson I*. The district court's inquiry into the effects of the incident on the jurors scrupulously carried out this mandate.

8

While the appellants complain that the district court should not have inquired into whether the jurors were intimidated or able to remain impartial, that is precisely what we instructed the court to do. Our mandate was to conduct a *Remmer* hearing "to determine whether *all the jurors remained impartial throughout the case.*" *Johnson I*, 954 F.3d at 182 (emphasis added). We held that the district court's initial response was deficient because it did not conduct a hearing to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial." *Id.* at 180 (quoting *Remmer*, 347 U.S. at 229–30). We faulted the district court for "fail[ing] to consider the *effect* on the jurors of the perceived external contact": The question "whether a photograph was taken was not dispositive of the prejudice inquiry" because "one or more jurors may have *felt* intimidated regardless." *Id.* at 181. In addition to potential prejudice, we recognized a "direct concern of . . . actual juror intimidation and resulting bias." *Id.* at 182.

Moreover, we favorably cited *United States v. Hines*, 717 F.2d 1481 (4th Cir. 1983), in which the district court "conducted a *Remmer* hearing to determine whether the juror's impartiality had been compromised" by the juror's observation that a law-enforcement agent was taking photographs of people leaving the courthouse, *Johnson I*, 954 F.3d at 182. We explained that by "conducting a *Remmer* hearing, the district court in *Hines* effectively eliminated any concerns that the juror's ability to remain impartial may have been compromised by his perceptions and conclusions regarding the activity observed." *Id*. Significantly, the district court in *Hines* relied on a juror's testimony that "he was not concerned about the photographing" to find no prejudice. 717 F.2d at 1491.

9

Given all this, the only possible interpretation of *Johnson I*'s mandate is that the district court was required to determine the subjective impact of the alleged photographing incident on the jurors, including whether the incident intimidated them or compromised their impartiality. The district court explicitly structured its inquiry around this "straightforward mandate*." Johnson*, 2021 WL 4037708, at *6.* The court's questions— whether each juror "fe[lt] intimidated by anything that had occurred" or was "able to remain an impartial juror" and "keep an open mind as the trial continued"—faithfully executed that mandate. J.A. 2298–99. We will not move the goalposts now.

## B.

In addition to following this court's mandate, the district court also needed to comply with Federal Rule of Evidence 606(b). It did. The court successfully charted a course through these various currents with its questioning that carried out our mandate without admitting evidence rendered inadmissible by the Rule.

Under Rule 606(b), "[d]uring an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1). But a juror "may testify about whether . . . an outside influence was improperly brought to bear on any juror." *Id.* 606(b)(2).

The testimony that the court considered—about whether the incident intimidated a juror or made her unable to remain impartial and keep an open mind during the trial—is not testimony about the "effect of anything on . . . [any] juror's vote" or "any juror's mental

10

processes concerning the verdict." Fed. R. Evid. 606(b)(1). The court provided two instructions to each juror to ensure the juror's testimony did not transgress Rule 606(b). Before asking any questions, the court told each juror to "be careful not to tell us about the jury's deliberations on guilt or innocence, or about how you reached your verdict." J.A. 2296–97. Then, before asking about intimidation and impartiality specifically, the court instructed each juror "to draw a line between events that occurred prior to the start of your deliberations and events that happened after you began deliberations. . . . [Y]ou should not tell us anything about what happened, what was said, what you thought or what you felt after deliberations began." *Id.* at 2298. And when a juror offered inadmissible testimony— as Juror No. 3 did when she said the incident "didn't have anything to do with the decision," *id.* at 2328—the court disregarded that testimony because it was prohibited by Rule 606(b), *see Johnson*, 2021 WL 4037708, at *9.

The remaining testimony concerned only whether the jurors felt intimidated or were able to remain impartial during the two weeks of trial between the incident and the beginning of deliberations. *See id.* at 2809. We do not read Rule 606(b)'s bar on testimony about the "effect of anything on . . . [any] juror's *vote*" or "any juror's mental processes *concerning the verdict*" as broad enough to encompass juror testimony about being intimidated or impartial prior to deliberations. Fed. R. Evid. 606(b)(1) (emphasis added). There is a difference between testimony about whether an incident affected a juror's *vote* or thoughts *concerning the verdict* and testimony about whether a juror was intimidated or remained impartial while observing the trial before deliberations began. *See United States*

11

*v. Lawson*, 677 F.3d 629, 647 (4th Cir. 2012) ("As we have explained, Rule 606(b) prohibits testimony concerning jurors' thought processes during deliberations.").

In sum, this court's mandate required the district court to determine whether the alleged photographing incident caused the jurors to feel intimidated or whether they were able to remain impartial. Given the district court's limiting instructions, the testimony it received on these matters was not barred by Rule 606(b). Therefore, it did not abuse its discretion when it relied on the jurors' unanimous assurances that they were able to remain impartial to conclude that there was no "reasonable possibility that the jury was influenced by an improper communication." *Johnson I*, 954 F.3d at 180 (quotation marks omitted).

## III.

Even assuming, purely *arguendo*, that the district court abused its discretion by considering testimony that was impermissible under Rule 606(b), the government still met its burden to show that the alleged photographing incident did not prejudice appellants, thus rendering any potential Rule 606(b) errors harmless.

## A.

If a court is "confronted with a credible allegation of an improper external contact" with the jury, *Johnson I*, 954 F.3d at 180, the improper contact is deemed presumptively prejudicial if the defendant "introduc[es] competent evidence that the extrajudicial communications or contacts were more than innocuous interventions," *Basham*, 561 F.3d at 319 (quoting *United States v. Cheek*, 94 F.3d 136, 141 (4th Cir. 1996)). The presumption of prejudice "is not conclusive, but the burden rests heavily upon" the government to establish "that such contact with the juror was harmless to the defendant." *Remmer*, 347

12

U.S. at 229. A "presumption of prejudice . . . does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict?" *United States v. Olano*, 507 U.S. 725, 739 (1993). Here, both parties agree that "Juror No. 4's report should be analyzed as an external contact," and the district court "adopt[ed] the parties' consensus view." *Johnson*, 2021 WL 4037708, at *14. Because a credible allegation of improper external contact had been made, the district court reasoned that "the Government willingly shoulders the presumption of prejudice and the associated burden of showing" that such contact was harmless. *Id.*

The government may rebut the "presumption of prejudice by showing that there was 'no reasonable possibility' that the jury 'was influenced by an improper communication.'" *Johnson I*, 954 F.3d at 180 (quoting *Basham*, 561 F.3d at 319). To determine whether the government successfully rebuts the presumption, courts "look at a variety of factors," including "the extent of the improper communication, the extent to which the communication was discussed and considered by the jury, the type of information communicated, the timing of the exposure, and the strength of the Government's case." *Basham*, 561 F.3d at 320.

Two of these factors—the extent of the improper communication and the type of information communicated—cut strongly against a finding of prejudice here. The district court found, and appellants do not contest, that no actual photographing or attempted intimidation of the jury ever happened. The only external influence on the jury was thus Juror No. 4's erroneous report. Considering the fleeting nature of this incident and the ameliorative measures taken by the district court, the extent of the improper

13

communication was minimal. Likewise, the type of information communicated to the jury was only a false allegation of photographing, which is not prejudicial because it had nothing to do with the merits of the case.

Given the straightforward application of these factors, our analysis focuses on the remaining ones—the strength of the government's case, the extent to which the improper communication was considered by the jury, and the timing of the exposure. Therefore, to determine whether the government would meet its burden of rebutting the presumption of prejudice even disregarding the testimony that appellants have challenged under Rule 606(b), we first analyze the strength of the government's case and then evaluate together the timing of the exposure and the degree to which the improper communication was considered.

### B.

Here, the strength of the government's case is substantial, and the risks posed by exposure to the allegation were minimal. The appellants claim that the government cannot meet its burden to rebut the presumption of prejudice absent the allegedly improper Rule 606 testimony. We disagree. The trial and *Remmer* hearing show that there was no reasonable possibility of improper influence given the weight of the evidence against appellants and the district court's timely curative steps to limit the jury's consideration of the alleged photographing incident.

First, appellants faced a mountain of evidence against them, making it unlikely that the alleged photographing incident affected the jury's deliberations. During a 10-week trial, the government introduced evidence showing that for more than a decade, appellants

14

committed numerous crimes on behalf of their gang. *Johnson I*, 954 F.3d at 176; *Johnson*, 2021 WL 4037708, at *1. Eyewitness testimony, including from police informants, showed that "Johnson acted as a leader of the gang, overseeing an extensive drug distribution operation and attendant acts of violence." *Johnson I*, 954 F.3d at 176–77. "According to government witnesses, Johnson ordered the murders of two individuals whom the gang believed were cooperating with law enforcement." *Id.* at 177. The government also offered evidence showing that the gang shielded its illicit operations "by terrorizing those who dared to cooperate with the police." *Id.* (quotation marks omitted). The government called more than 50 witnesses and offered over 500 exhibits, including fingerprint analysis, cell phone location data, text messages, social media posts, and appellants' own statements.

The extensive record makes apparent that the government's case was quite strong. This ample evidence enabled the government to meet its burden to rebut the presumption of prejudice even setting aside the testimony that appellants challenge under Rule 606(b). *See Lawson*, 677 F.3d at 646 (considering the strength of the evidence in "determining whether the government has rebutted this presumption of prejudice"); *United States v. Williams-Davis*, 90 F.3d 490, 497 (D.C. Cir. 1996) (finding no risk of prejudice where "the evidence against defendants was overwhelming"); *United States v. Thornton*, 1 F.3d 149, 155 (3d Cir. 1993) (reasoning that any "claim of prejudice is further undermined by the volume of incriminating evidence presented by the government during the remainder of the trial").

Second, when we consider the curative measures the district court took in response to Juror No. 4's allegations, the risk to jury impartiality posed by the communication was

15

minimal. After Juror No. 4 brought this issue to the district court's attention two weeks before deliberations began, he was removed from the jury and replaced by an alternate. *Johnson*, 2021 WL 4037708, at *3. Thus, he took no part in deliberations on the verdict.

After the district court investigated the incident and found no corroboration that any photographing had in fact occurred, it issued a curative statement, informing the jury that the "matter was investigated" but "no images, films, videos of the sort" were found. *Id.* Several jurors confirmed that this instruction put the matter to rest. For example, Juror No. 5 testified that she felt reassured when told that "everything was fine and there was nothing there." *Id.* at *10. When judges issue curative instructions, we presume juries follow them. *See United States v. St. Louis*, 889 F.3d 145, 155 (4th Cir. 2018).

Moreover, the *Remmer* hearing revealed that Juror No. 4's allegation was "a fleeting event that the jury readily discounted in the two subsequent weeks of trial." *Johnson*, 2021 WL 4037708, at *7. The district court concluded that "any impact of Juror No. 4's report quickly dissipated," for every "juror testified that there were either no, or minimal, further conversations regarding Juror No. 4's allegations." *Id.* at *27. One juror, for example, reported that any mention of the allegation "really didn't evolve into a real conversation." *Id.* These uncontested factual findings show that the risk of Juror No. 4's report influencing the jury was slight. *See Hines*, 717 F.2d at 1491 (finding no "possible prejudicial impact" in part because of how little an incident was "discussed by him or the other jurors").

The timing of the incident—two weeks prior to deliberations—also shows that the allegation was out of mind by the time the jury rendered its verdict. We have held that even external communications occurring "right before jury instructions" did not prejudice the

jury where the communication is "devoid of substantive content." *Basham*, 561 F.3d at 320–21 (quotation marks omitted). Communication devoid of substantive content—like the report here, which did not touch the merits of the case—that occurs *two weeks* before deliberations is thus plainly non-prejudicial.

The uncontradicted evidence, therefore, shows that the alleged photographing incident was barely discussed. Considering Juror No. 4's dismissal, the district court's curative measures, the cursory discussions of the allegation, and the fact that it occurred two weeks before deliberations, there is no reasonable possibility that the incident influenced the jury's verdict. Taken together with the strength of the government's case, these facts show the government met its burden in rebutting the presumption of prejudice. Once courts analyze "outside intrusions upon the jury for prejudicial impact," the inquiry ultimately comes down to whether "the intrusion affect[ed] the jury's deliberations and thereby its verdict." *Olano*, 507 U.S. at 739. Here, it clearly did not.

In sum, with or without the putatively improper testimony, full consideration of the record demonstrates that the photo allegation was harmless. Johnson's only remaining line of reasoning is to turn prejudice presumed into prejudice *per se*. But such a move would violate *Remmer*. *See* 347 U.S. at 229–30 (instructing the district court to hold a hearing to assess the "prejudicial" effect of the alleged improper influence and see if "such contact with the juror was harmless").

Therefore, even if Rule 606(b) barred the admission of juror testimony about the subjective effect of the photo allegation, the government still rebutted the presumption of prejudice. The district court correctly concluded that the "fully developed record" makes

17

clear "that there was no reasonable possibility that the jury was influenced by an improper communication." *Johnson*, 2021 WL 4037708, at *15 (quotation marks omitted).

IV.

When we remanded this case for the district court to conduct a *Remmer* hearing, we did so in order to root out any "potentially widespread taint of the jury." *Johnson I*, 954 F.3d at 181. If "extraneous information *may* have tainted the jury, due process requires the opportunity to show that the information *did* taint the jury to [defendant's] detriment." *Ewing v. Horton*, 914 F.3d 1027, 1031 (6th Cir. 2019). The district court provided that opportunity on remand, and appellants still cannot show any such taint.

The district court polled each juror one-by-one and each affirmed his or her impartiality. For example, when Juror No. 1 was asked whether she remained impartial after the alleged incident, she testified, "Oh, yes. Absolutely." *Johnson*, 2021 WL 4037708, at *9. Moreover, the district court found that Juror No. 1's "body language and the intensity with which she expressed" her impartiality were "persuasive." *Id.* Similarly, Juror No. 3 reported that she "didn't pay much attention" to the allegation that they were photographed. *Id.* And Juror No. 11 "didn't think twice about it" and testified that he could continue as a fair and impartial juror. *Id.* at *11. Likewise, the rest of the jurors each confirmed they were not intimidated and could remain impartial.

As appellate judges, we must be especially deferential to these findings, for credibility and juror impartiality are quintessential determinations for district courts. Indeed, "[r]eviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a

18

host of factors impossible to capture fully in the record" such as "the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." *Skilling v. United States*, 561 U.S. 358, 386 (2010). That is why in reviewing claims of juror bias, "the deference due to district courts is at its pinnacle." *Id.* at 396; *see also Porter v. Zook,* 898 F.3d 408, 426 (4th Cir. 2018) ("Impartiality is not a technical conception. It is a state of mind," for which "the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." (quotation marks omitted)).

Having now obeyed our mandate and conducted a proper *Remmer* hearing, the district court correctly concluded that the alleged photographing incident did not influence the jury's decision. Seeing no legal error or abuse of discretion, we affirm the district court's reinstatement of appellants' guilty verdicts.

*AFFIRMED*