**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 20-4019**

───────────

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

   v.

LEE ELBAZ, a/k/a Lena Green,

        Defendant - Appellant.

───────────

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Theodore D. Chuang, District Judge. (8:18-cr-00157-TDC-1)

───────────

Argued: December 9, 2021                        Decided: June 30, 2022

───────────

Before RICHARDSON, RUSHING, Circuit Judges, and TRAXLER, Senior Circuit Judge.

───────────

Affirmed in part, vacated in part, and remanded by published opinion. Judge Richardson wrote the opinion, in which Judge Rushing and Senior Judge Traxler joined.

───────────

**ARGUED:** Eric Joseph Brignac, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. James I. Pearce, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** G. Alan DuBois, Federal Public Defender, Jennifer C. Leisten, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Nicholas A. McQuaid, Acting Assistant Attorney General, Robert A. Zink, Acting Deputy Assistant Attorney General, Caitlin R. Cottingham, Assistant Chief, Fraud

Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

———————

RICHARDSON, Circuit Judge:

Lee Elbaz and her confederates orchestrated a multimillion-dollar fraud scheme, operating from Israel and targeting unsophisticated victims worldwide. Posing as an investment firm, Elbaz and her partners solicited "investments" that cost fraud victims over $100 million, including millions from victims in the United States. While vacationing in New York, Elbaz was arrested and later convicted for conspiring to commit wire fraud and for substantive wire fraud itself. She was sentenced to 22 years in prison and required to pay $28 million in restitution.

Elbaz argues that the wire-fraud statute does not apply to her extraterritorial conduct, so she did not commit a crime under United States law. She also argues that the district court committed two procedural errors warranting a new trial: refusing to compel immunity for witnesses she planned to call and refusing to grant a mistrial after a juror overheard a disparaging remark about Elbaz. And, finally, she raises several challenges to her sentence.

We reject most of these challenges. While the wire-fraud statute does not apply extraterritorially, the focus of the statute is on misuse of American wires. As her conduct misused American wires, she was properly prosecuted for a domestic offense. And the district judge properly refused to compel immunity to witnesses and denied a mistrial. But while we reject most of Elbaz's alleged sentencing errors, we agree the district court erred in imposing broad restitution that went beyond victims of domestic wire fraud.

3

I.      **Factual Background and Procedural Posture**

A.      **The Fraud**

Elbaz and her partners' fraud scheme involved so-called "binary options." These all-or-nothing options place a bet on the price of an asset at a certain time. And typically, that time is shortly after the binary option is purchased, sometimes only minutes or hours.[1] The option buyer does not hold the asset, and unlike other options, the option does not confer the right to purchase or sell that asset. Instead, the owner profits by a fixed amount if he correctly bets that the asset's price will be above a target (or below it or within a range, depending on how the option is structured). If the owner bets wrong, he loses his investment. The all-or-nothing aspect of binary options, combined with the short time frame, looks an awful lot like gambling and seems to lead to many fraud schemes with binary options at the center. *See* SEC Off. of Inv. Educ. & Advoc., *Investor Alert: Binary Options and Fraud*, Investor.gov (June 6, 2013) (ECF attachment) [https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-alerts/investor-61].

The scheme here operated in three layers. First, binary-option investments were marketed by two foreign companies, BinaryBook and BigOption. [J.A. 10323.] Second, when a customer responded to an advertisement, they would be contacted by a

---

[1] For example, a binary option might expire in five hours with a "strike price" of $70 for a certain stock. In other words, it's a bet that the price of a certain stock will be above $70. And the option will have a payout if you win—let's say $100—and a cost to buy, let's say $40. If the stock price is above $70 at expiration, you get $100, and so you profit $60. If the stock price is $70 or lower, you get nothing, and lose your $40.

4

"conversion" agent from a company called Linktopia, who would persuade the customer to become a client by depositing at least $250. Third, once the customer was on the hook, responsibility for "retention" would transfer to Yukom Communications, based in Israel.

Elbaz worked for Yukom in Israel in various capacities, including as its Chief Executive Officer. [J.A. 1497-99.] Elbaz and others at Yukom made fraudulent representations to retain investors by convincing them to deposit more money, then stopping them from withdrawing their funds. Yukom's retention agents used fake names and told investors significant lies about their education, work experience, compensation incentives, location, and investment performance. [*See, e.g.*, J.A. 1425-30, 1522-23, J.A.1522-23, J.A. 1992-93, 2108; J.A. 2777.] And these lies supported their various techniques to "lock the client in," J.A. 1692, obtaining more deposits and refusing to permit withdrawals. [See J.A. 1691-92; *see also* J.A. 2186, 3458]. In total, the scheme netted more than $100 million in deposits, including millions from American victims. [J.A. 2800; appellee's br. at 7; appellant's br. at 14; J.A. 6774]. As part of the scheme, Elbaz caused at least three domestic wire transmissions to occur in Maryland: (1) an email from a retention agent to a Maryland victim that included wire-transfer instructions, (2) a telephone call from a retention agent to a second Maryland victim, and (3) an email requesting a third Maryland victim complete a deposit confirmation form. [J.A. 68–69.]

### B.    Legal Proceedings

A grand jury indicted Elbaz for conspiracy to commit wire fraud and for three substantive wire-fraud counts, based on the three wire transmissions sent to victims in

5

Maryland. [J.A. 55-70.] And when Elbaz traveled to New York on vacation, she was arrested.

Before trial, Elbaz sought to dismiss the indictment, asserting that the wire-fraud statute did not apply because her conduct was extraterritorial. [J.A. 79-92.] The district court acknowledged that the wire-fraud statute does not apply extraterritorially but rejected Elbaz's argument because it found that the charged wire frauds were domestic offenses based on the use of American wires to target American victims. [J.A. 459-67.]

At trial, Elbaz planned to call four Israeli witnesses to testify. But before trial the United States informed the witnesses that three of them were under indictment and warned them about testifying. All four witnesses then declined to testify. Elbaz then sought to compel the government to grant immunity to these witnesses. The district court denied this extraordinary request. [J.A. 863, 894.]

During jury deliberations, one juror—Juror 9—overheard a negative conversation in Hebrew about Elbaz while standing in line at a drugstore. [J.A. 4418, J.A. 4,420.] Juror 9 spoke enough Hebrew to generally understand but did not know the people speaking in this coincidental encounter. Juror 9 did not immediately disclose his encounter to the court. Instead, he continued deliberations for a day before informing the court, though without telling any other jurors about the incident. Juror 9 said that what he had heard made him change his opinion, from leaning toward acquitting to leaning toward convicting. [J.A. 4425.] He was excused, but Elbaz sought a complete mistrial. Elbaz argued that Juror 9 tainted the jury and its deliberations by continuing to sit on the jury for a day after being influenced by the drugstore conversation. The court responded by conducting hearings to

6

confirm none of the remaining jurors had heard any outside information. Satisfied that none had, the court sat an alternate juror, ordered the jury to start deliberations from scratch, and allowed the reconstituted jury to begin deliberating.

The jury convicted Elbaz on all counts. [J.A. 4486-88.] The court then sentenced Elbaz to 264 months in prison, followed by three years of supervised release. [J.A. 6771-72.] The court also ordered Elbaz to pay $28 million in restitution. [J.A. 6826.] Elbaz timely appealed. [J.A. 6,776, J.A. 6828.]

## II.    Discussion

Elbaz challenges her conviction on three grounds. She first asserts that the wire-fraud statute was impermissibly applied to convict her for extraterritorial conduct. She alternatively claims that she must be granted a new trial because her proposed witnesses were not granted use immunity and because the juror's exposure to improper contact caused irreparable prejudice. Elbaz also challenges her sentence—including restitution—on various grounds. Except for the restitution award, we reject each challenge.

### A.    Extraterritoriality

Elbaz contends that the federal wire-fraud statute criminalizes only domestic, not extraterritorial, conduct. And this, she argues, requires vacating her conviction because the wire-fraud scheme was devised and carried out in Israel.

Courts have long presumed "that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Austrl. Bank Ltd.*, 561 U.S. 247, 255 (2010) (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)). This presumption against extraterritoriality "rests

7

on the perception that Congress ordinarily legislates with respect to domestic, not foreign, matters." *Id*.

This presumption, however, can be rebutted. To determine whether it has been overcome, we conduct a two-step inquiry. At step one, if a statute lacks a clear indication of an extraterritorial application, it has none. *See id.* at 265. When a statute applies extraterritorially, we apply it extraterritorially as far as the statutory indication directs.

At step two, if the statute does not apply extraterritorially, we then ask whether the case before us "involves a domestic application of the statute." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337 (2016). And to identify a permissible domestic application, we must determine the statute's "focus" and whether the conduct relevant to the statute's focus occurred inside the United States. *Id.* It is not enough for conduct to merely "touch and concern the territory of the United States," *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124–25 (2013); the conduct must be domestic.

At the first step, we agree that the wire-fraud statute lacks any affirmative statutory instruction that it criminalizes purely extraterritorial conduct. But, at the second step, we find the statute's focus to be on the use of the wire—not the underlying fraudulent scheme. So Elbaz's conviction based on misuse of wires within the United States stands as a permissible domestic prosecution.

### 1.    Wire Fraud Does Not Apply Extraterritorially

We agree with Elbaz at the first step of our inquiry that the wire-fraud statute provides no affirmative directive that overcomes the presumption against

8

extraterritoriality. Nowhere within the wire-fraud statute did Congress clearly indicate that it applied to foreign conduct.[2]

There is one reference to "foreign commerce," but it is not enough to rebut the presumption. Section 1343 includes a jurisdictional hook, limiting its application to wires made "in interstate or foreign commerce." 18 U.S.C. § 1343. Yet a "general reference to foreign commerce in the definition of 'interstate commerce' does not defeat the presumption against extraterritoriality." *Morrison*, 561 U.S. at 263. Rather, such language generally is intended to bring commerce "between [a] foreign country and [a] State" within the statute's reach. *See id.* at 263 n.7 (alteration in original); *see also United States v. Kim*, 246 F.3d 186, 189 (2d Cir. 2001). Because this jurisdictional language fails to rebut the presumption against extraterritorial application, and there are no other indications of extraterritorial application, the statute does not apply to extraterritorial conduct.

### 2.     Elbaz's Offenses Were Domestic

Having found that wire fraud is limited to domestic conduct, we turn to step two of our inquiry. There, we must identify the wire-fraud statute's "focus." *RJR Nabisco*, 579 U.S. at 337. The statutory focus is "the object of the statute's solicitude—which can turn on the conduct, parties, or interests that it regulates or protects." *WesternGeco LLC v. ION*

---

[2] *See* 18 U.S.C. § 1343 ("Whoever, having devised or intending to devise any scheme or artifice to defraud . . . transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined . . . or imprisoned . . . ."); § 1349 ("Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.").

*Geophysical Corp.*, 138 S. Ct. 2129, 2138 (2018) (cleaned up). And to determine the focus, we turn to the text and structure of the act, without regard for any secret concern of members of Congress. *Id.* "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad . . . ." *RJR Nabisco*, 579 U.S. at 337.

The wire-fraud statute has three elements. Two are substantive: (1) the defendant devised, or intended to devise, a scheme or artifice to defraud; and (2) the defendant used a wire to transmit any signal to execute the scheme or artifice. *United States v. Taylor*, 942 F.3d 205, 213–14 (4th Cir. 2019).[3] The third element is jurisdictional: The wire must be "in interstate or foreign commerce." *Id.* at 214 (noting that the interstate-or-foreign-commerce element "is a jurisdictional element").[4]

We can easily reject this third, jurisdictional element as the statutory focus. The "substantive elements primarily define the behavior that the statute calls a violation of

---

[3] The substantive elements can be met by several alternative means. For example, the scheme or artifice "to defraud" may alternatively be a scheme or artifice "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." § 1343. And the transmission by "wire" may alternatively be a transmission by "radio or television communication." § 1343. So too the wire transmission of "signals" may also be satisfied by the wire transmission of "writings, signs, . . . pictures, or sounds." But the alternative means available to accomplish the substantive elements does not affect our analysis that there are two substantive elements here.

[4] Some cases omit the jurisdictional element where unimportant to the issue presented. *See, e.g.*, *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006). And others collapse the use of a wire for executing the scheme and the jurisdictional requirement that the wire be in interstate and foreign commerce into a single element. *See, e.g.*, *United States v. Doty*, 832 F. App'x 174, 177–78 (4th Cir. 2020) (unpublished). But as we made plain in *Taylor*, these are technically separate statutory requirements.

10

federal law." *Torres v. Lynch*, 578 U.S. 452, 457 (2016) (cleaned up). The substantive elements describe "'the harm or evil' the law seeks to prevent." *Id.* (quoting Model Penal Code § 1.13(10)). The jurisdictional element, by contrast, merely "ties the substantive offense . . . to one of Congress's constitutional powers." *Id.* So jurisdictional elements are never the statute's "focus"—the conduct, parties, or interest that the statute seeks to regulate. *See WesternGeco*, 138 S. Ct. at 2138.

The focus must thus be either the scheme to defraud or the use of wire communication for executing the scheme. The statute's text and our precedent reveal that the focus of the wire-fraud statute is the use of a wire, not the scheme to defraud. The wire transmission itself is "the actus reus that is punishable by federal law." *United States v. Jefferson*, 674 F.3d 332, 367 (4th Cir. 2012); *see also United States v. Ramirez*, 420 F.3d 134, 144–145 (2d Cir. 2005). Thus, the use of a wire is the "essential conduct prohibited by § 1343." *Jefferson*, 674 F.3d at 366 (quoting *United States v. Pace*, 314 F.3d 344, 349 (9th Cir. 2002)); *accord Pasquantino v. United States*, 544 U.S. 349, 358, 370 (2005) ("[T]he wire fraud statute punishes fraudulent use of domestic wires" and reflects the choice to "free the interstate wires from fraudulent use, irrespective of the object of the fraud."). The wire-fraud statute also criminalizes each wire transmission as a separate offense that may be separately punished rather than punishing each scheme as a separate offense. *Jefferson*, 674 F.3d at 367. And the method of determining venue for a wire-fraud prosecution supports this conclusion. Venue is based on the location of the wire transmissions. *United States v. Ebersole*, 411 F.3d 517, 524 (4th Cir. 2005). So venue is proper where wire fraud "occurred," including where each wire transmission was sent and

where it was ultimately received. *Id.* at 527. Where the scheme was devised is irrelevant to venue.

Unlike the wire-transmission element, a scheme to defraud is not an essential conduct element of wire fraud. *See Jefferson*, 674 F.3d at 366. "[T]he devisal of a scheme relates only to establishing the *mens rea* element of the wire fraud offense." *Id.* at 368; *see Ramirez*, 420 F.3d at 144. Indeed, no scheme need be devised at all. It suffices for the defendant to "intend" to devise a scheme. § 1343. So while a scheme to defraud (or at least the intention to devise a scheme) remains a necessary element, it is not the essential conduct being criminalized and thus not the focus of § 1343.

Our sister circuits that have addressed this issue agree that the focus of the wire-fraud statute is the use of a wire to execute a scheme. *See, e.g.*, *United States v. Hussain*, 972 F.3d 1138, 1143–45 (9th Cir. 2020); *United States v. McLellan*, 959 F.3d 442, 469 (1st Cir. 2020). Joining them, we agree Elbaz's conviction must stand as a "permissible domestic application" so long as the charged wire transmissions were domestic. *See RJR Nabisco*, 579 U.S. at 337. They were.

Transmission of a message in furtherance of the scheme occurs in at least two locations: "where the wire transmission at issue originated" and where it "was received." *Jefferson*, 674 F.3d at 369. Here, the transmissions were received by victims in Maryland using wires in Maryland. So Elbaz's convictions are all permissible domestic applications of the wire-fraud statute.

Elbaz's conspiracy conviction under § 1349 was also a domestic application. *Cf. United States v. Ojedokun*, 16 F.4th 1091, 1107 (4th Cir. 2021) ("[C]onspiracies operate

12

'wherever the agreement was made or wherever any overt act in furtherance of the conspiracy transpires,' which may include a place where 'the defendant has never set foot.'"). The focus of § 1349 is the "object of the attempt or conspiracy." § 1349 ("Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."). And that object is the *offense* that the conspirators conspire to commit. § 1349; *see Black's Law Dictionary* (8th ed. 2004) ("object" is the thing "to which thought, feeling, or action is directed" or the thing "sought to be attained or accomplished; an end, goal, or purpose"); *see also* Wayne R. LaFave, Criminal Law 833–34 (6th ed. 2017). Here, the substantive wire-fraud counts, which were domestic, were the objects of the conspiracy. And Elbaz concedes that the extraterritoriality analysis of her conspiracy conviction mirrors the substantive-wire-fraud counts. *See RJR Nabisco*, 579 U.S. at 341 (assuming that a conspiracy offense's "extraterritoriality tracks that of the provision underlying the alleged conspiracy"); *WesternGeco*, 136 S. Ct. at 2137 ("If the statutory provision at issue works in tandem with other provisions, it must be assessed in concert with those other provisions."). So the conspiracy conviction was a domestic application of the statute in so far as the object of the conspiracy was domestic wire fraud.[5]

---

[5] To be sure, Elbaz had an agreement to defraud people around the world using wires. In some abstract sense, that is a "conspiracy" to commit "wire fraud." But this extraterritorial "wire fraud" is not the crime of wire fraud under the United States Code. And since it is not a crime, it cannot be the object of a conspiracy under the United States Code. So the actual criminal conspiracy here is just the agreement to commit domestic wire fraud—a subpart of the broader agreement. And as you will see, this will be important to our restitution analysis.

13

### B.      Trial Issues

Elbaz also argues she deserves a new trial for two reasons:  The district court should have required the government to grant immunity to witnesses she planned to call, and the district court should have ordered a mistrial after a juror overheard prejudicial remarks about her.  We reject both arguments.

### 1.      Denial of Use Immunity to Witnesses Was Not an Abuse of Discretion

Elbaz argues that the district court should have compelled the government to grant immunity to potential defense witnesses.  District courts lack the inherent power to grant immunity.  *United States v. Klauber*, 611 F.2d 512, 517 (4th Cir. 1979).  The power to seek witness immunity is conferred by Congress exclusively on the Executive for its discretionary use.  18 U.S.C. § 6003(b) (providing that a United States Attorney may seek an immunity order "when in his judgment" that testimony is "necessary to the public interest"); *see United States v. Karas*, 624 F.2d 500, 505 (4th Cir. 1980); *Earl v. United States*, 361 F.2d 531, 534 (D.C. Cir. 1966) (Burger, J.).  Even so, we have suggested that in some extreme circumstances a district court may be able to order the prosecution to seek immunity.  *See United States v. Tindle*, 808 F.2d 319, 326 (4th Cir. 1986).  But if such an extreme case exists, it is only when the defendant "makes a decisive showing of prosecutorial misconduct or overreaching."  *United States v. Abbas*, 74 F.3d 506, 512 (4th Cir. 1996).[6]

---

[6] We have stated that "the district court can compel the prosecution to grant immunity when (1) the defendant makes a decisive showing of prosecutorial misconduct (Continued)

14

And here, there is not a decisive showing of such extraordinary misconduct. In fact, there is *no showing* of prosecutorial misconduct. By the time Elbaz sought the testimony in April 2019, a federal grand jury had returned a sealed indictment charging three of the potential witnesses for their involvement in the fraud scheme. After consulting the district court on how to provide self-incrimination warnings, the government partially unsealed the indictment to inform the witnesses' counsel and to advise that people in their position generally choose not to testify. *See* J.A. 895 (finding that providing these witnesses with essentially truthful information after consulting the court was appropriate and prudent). In doing so, the government provided a reasonable warning to the newly indicted co-conspirators. *Cf. United States v. Dire*, 680 F.3d 446, 469 (4th Cir. 2012). After receiving this information, the potential witnesses refused to voluntarily testify. Nothing here even suggests prosecutorial misconduct or overreach. So the district court did not err by declining to compel the prosecutor to grant immunity.

### 2.     Any Presumption of Prejudice From Improper Jury Contact Was Successfully Rebutted

Elbaz next argues that the district court erred in failing to declare a mistrial instead of merely dismissing Juror 9, who coincidentally overheard an unflattering conversation

---

or overreaching *and* (2) the proffered evidence would be material, exculpatory and unavailable from all other sources." *Abbas*, 74 F.3d at 512. But we did not find immunity was warranted in *Abbas*. Indeed, we are unaware of any case—and Elbaz has not proffered any—where we ordered a district court to grant use immunity. Our recitation of this alleged "power" originates in our *Tindle* decision, which rejected the defendant's claim that immunity should have been granted by the court. 808 F.2d at 326–27. As we again face a circumstance where no prosecutorial overreach or misconduct exists, we need not decide here whether a narrow power does exist for the judiciary to force a grant of immunity.

about the defendant while in line at a drugstore.  We disagree.  The district court acted well within its discretion to address this issue by removing the juror, ensuring no outside information was conveyed to other jurors, and restarting deliberations with an alternate juror and orders to proceed from scratch.[7]

The Sixth Amendment guarantees that a criminal defendant receives a speedy, public trial before an impartial jury.  U.S. Const. amend. VI.  Guarding that constitutional guarantee of impartiality has long required ensuring that external influences do not affect a jury's deliberation.  *Mattox v. United States*, 146 U.S. 140, 149–150 (1892); *United States v. Reid*, 53 U.S. 361, 366 (1851), *overruled on other grounds by Rosen v. United States*, 245 U.S. 467, 469–70 (1918); *Barnes v. Joyner*, 751 F.3d 229, 240 (4th Cir. 2014).  Given the nature of this right, "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial."  *Remmer v. United States*, 347 U.S. 227, 229 (1954).[8]  To

---

[7] "[I]n cases involving possible improper communication with jurors, 'because the ultimate factual determination regarding the impartiality of the jury necessarily depends on legal conclusions, it is reviewed in light of all the evidence,' and therefore we apply a 'somewhat narrowed' modified abuse of discretion standard that grants us 'more latitude to review the trial court's conclusion in this context than in other situations.'" *United States v. Basham*, 561 F.3d 302, 319 (4th Cir. 2009) (quoting *United States v. Cheek*, 94 F.3d 136, 140 (4th Cir. 1996)).

[8] Some courts have suggested that post-*Remmer* developments—*Smith v. Phillips*, 455 U.S. 209, 215 (1982), *United States v. Olano*, 507 U.S. 725, 738–39 (1993), and Federal Rule of Evidence 606(b)—narrowed or overturned *Remmer*'s presumption of prejudice. *See, e.g.*, *United States v. Sylvester*, 143 F.3d 923, 934 (5th Cir. 1998) ("[T]he *Remmer* presumption of prejudice cannot survive *Phillips* and *Olano*.").  But the Fourth Circuit continues to adhere to a *Remmer* presumption when the contact goes beyond the innocuous. *United States v. Cheek*, 94 F.3d 136, 141 (4th Cir. 1996).

trigger this presumption, a defendant must introduce "competent evidence of extrajudicial juror contacts" that are "more than innocuous interventions." *United States v. Cheek*, 94 F.3d 136, 141 (4th Cir. 1996) (quoting *Haley v. Blue Ridge Transfer Co.*, 802 F.2d 1532, 1537 n.9 (4th Cir. 1986)). But the presumption is rebuttable. The Government defeats the presumption by establishing that "there exists no 'reasonable possibility that the jury's verdict was influenced by an improper communication.'" *United States v. Basham*, 561 F.3d 302, 320 (4th Cir. 2009) (quoting *Cheek*, 94 F.3d at 141).

Juror 9, over a weekend, overheard a comment while waiting in a drugstore checkout line. The comment—made in Hebrew, a language which Juror 9 somewhat understood—suggested that Elbaz had poor character and that important information was withheld at trial. Juror 9 then returned to deliberations for a full day without informing the court about the comments he overheard. But the next day Juror 9 notified the court and testified that he did not share the comment with other jurors. He also testified that the remarks affected his feelings of the case, pushing him toward finding Elbaz guilty.[9] The judge then removed that juror, replaced him with an alternate, and ordered the jury to completely restart deliberations.

---

[9] The Government argues that this testimony by the juror is prohibited by Federal Rule of Evidence 606(b), which limits testimony from a juror about "the effect of anything on that juror's . . . vote" during "an inquiry into the validity of a verdict." As it does not change our analysis, we need not decide whether Rule 606(b) precludes testimony given before any verdict or whether Rule 606(b)'s exceptions apply. *See* Rule 606(b)(2) (permitting testimony about whether "an outside influence was improperly brought to bear on any juror" and "extraneous prejudicial information was improperly brought to the jury's attention").

So we must decide whether this is a "more than innocuous intervention" sufficient to trigger a rebuttable presumption of a mistrial, and if so, whether the Government has rebutted that presumption. *Cheek*, 94 F.3d at 141. "Whether or not remarks overheard by the jury are sufficiently prejudicial to warrant overturning a conviction depends on the facts of each case." *Housden v. United States*, 517 F.2d 69, 70 (4th Cir. 1975). To determine whether a contact with a juror is innocuous or triggers the *Remmer* presumption we look to whether there was "(1) any private communication; (2) any private contact; (3) any tampering; (4) directly or indirectly with a juror during trial; (5) about the matter before the jury." *Cheek*, 94 F.3d at 141. And the Supreme Court has held that improper contact that was neither sought out by nor directed at the juror can still sometimes be prejudicial. *See, e.g.*, *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 551–54 (1976) (collecting cases). For our purposes, we can assume, without deciding, the contact was prejudicial because the Government rebutted the presumption by establishing that there is no reasonable possibility that the verdict was improperly influenced by the communication.

Juror 9 was replaced. And judicial questioning ensured no other jurors had heard outside information.[10] The juror who overheard the information testified that he did not mention it, so the other jurors were unaware of the remark. As a result, we are assured that no juror on the reconstituted jury was tainted by the overheard conversation. *See United States v. Forrest*, 649 F.2d 355, 357 (5th Cir. 1981) (affirming convictions based on the

---

[10] Elbaz also suggests that the judge's questioning itself prejudiced her. We disagree and find that the "trial judge made reasoned judgments in walking the line between detecting bias and creating bias." *United States v. Smith*, 919 F.3d 825, 834 (4th Cir. 2019).

trial judge's determination that the tampering of a juror was not known to the jurors who deliberated after the tainted juror was removed). The judge then instructed the jury to restart deliberations anew. Fed. R. Crim. P. 24(c)(3). And so we are not dealing with the same set of deliberations, but with a new set of deliberations, with jurors who had not heard the outside remark.[11]

Elbaz asks that we speculate that the jurors were contaminated by Juror 9 before he was excused. But the record shows that none of those jurors knew of the drugstore conversation. Even so, Elbaz argues that the jurors might have been contaminated by the change in countenance by Juror 9 after he overheard the conversation but before he was removed. But the judge ordered the new jury to disregard previous deliberations, and we presume juries follow instructions. *See United States v. Benson*, 957 F.3d 218, 230 (4th Cir. 2020).

By pointing to new deliberations with untainted jurors, the Government has rebutted the *Remmer* presumption. So we hold that the district court did not abuse its discretion in finding no reasonable possibility that the reconstituted jury was influenced by the drugstore

---

[11] This is not a case in which the verdict has been returned and the jury dismissed. In those circumstances, the government faces more difficulty in establishing that the information was neither known nor considered by the jurors that rendered the verdict. In contrast, when the court learns of an impropriety affecting only one juror during trial—as happened here—the usual response is to take steps to prevent prejudice to the remaining jurors, not to order a new trial. *See* 6 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, *Criminal Procedure* § 24.9(f) & n.135–36 (4th ed. 2021) (collecting cases). Because the court learned of the overheard drugstore conversation during the trial, it could ensure that no prejudice resulted—something that cannot so easily be done after the jury has rendered a verdict and been discharged.

19

conversation and refusing to grant a mistrial.  *See Smith*, 919 F.3d at 835 (noting the broad discretion afforded district courts in evaluating juror bias).

### C.      Sentencing

Elbaz raises several sentencing challenges.  She objects to considering foreign victims' losses in determining her term of imprisonment and her required restitution.  And she also brings various challenges against the conditions of supervised release imposed by the district judge.  Given our standard of review, we reject most of these challenges but agree the restitution order was improper.

### 1.      Foreign Victims' Losses Are an Appropriate Consideration in Sentencing

Separate from her claim that her conviction involved an improper extraterritorial application of the wire-fraud statute, Elbaz argues that the district court erred in considering her foreign conduct in sentencing.  Elbaz's fraud scheme targeted victims both in the United States and abroad, and the district court considered losses to foreign victims when calculating her baseline sentencing level and restitution owed.[12]

---

[12] At sentencing, the district court included foreign losses though noted that the "circuits are split on the issue," and estimated the amount of loss as about $28 million, resulting in a 22-level enhancement. J.A. 6,671. The court determined that the total offense level was 41, for a guideline imprisonment range of 324 to 405 months. [J.A. 6696.] The court then varied down to a total sentence of 264 months (or 22 years). [J.A. 6726.] Elbaz objected to the calculation, arguing it should only include losses incurred by victims inside the United States, caused by persons inside the conspiracy, and during the timeframe of the conspiracy, resulting in a loss amount of about $5 million. [J.A. 7218.] Accepting Elbaz's argument yields an 18-level enhancement under U.S.S.G. § 2B1.1(b)(1)(J).

20

Having found Elbaz was convicted of a domestic wire-fraud offense, we must determine whether the district court's consideration of the appropriate sentence is limited to information inside our borders. We conclude it is not.

We begin with the statutory directive that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. This "codifies the longstanding principle that sentencing courts have broad discretion to consider various kinds of information." *United States v. Watts*, 519 U.S. 148, 151 (1997); *see Pepper v. United States*, 562 U.S. 476, 489 (2011) ("Both Congress and the Sentencing Commission thus expressly preserved the traditional discretion of sentencing courts to 'conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come.'") (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)). So this Court lacks any basis to "invent a blanket prohibition against considering certain types of evidence at sentencing." *Watts*, 519 U.S. at 151.

And the Guidelines themselves confirm this understanding. In broadly defining the relevant conduct to be considered in determining the offense level, the Guidelines direct that the court consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and those undertaken by coconspirators that are "within the scope of the jointly undertaken activity" and are "in furtherance of that criminal activity" and "reasonably foreseeable." U.S.S.G. § 1B1.3; *see* § 1B1.4 ("In determining the sentence to impose . . . the court may consider,

21

*without limitation*, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.") (emphasis added).

Thus, the district court did not err by considering Elbaz's own acts and those of her coconspirators in sentencing. *See, e.g.*, *United States v. Spence*, 923 F.3d 929, 933–34 (11th Cir. 2019); *United States v. Zayas*, 758 F.3d 986, 989–90 (8th Cir. 2014); *United States v. Wilkinson*, 169 F.3d 1236, 1238 (10th Cir. 1999); *see also United States v. Enwerem*, 482 F. App'x 869, 871 n.* (4th Cir. 2012).[13]

### 2.    Restitution to Foreign Victims Was Improper

Elbaz must also pay restitution under the Mandatory Victims Restitution Act of 1996.  18 U.S.C. § 3663A.  The Act applies only to "the victim of the offense." *Id.*  So unlike sentencing, the broader concept of "relevant conduct" does not expand "the offense of conviction." *United States v. Llamas*, 599 F.3d 381, 390–91 (4th Cir. 2010); *see also United States v. Dridi*, 952 F.3d 893, 901 (7th Cir. 2020).  Thus, the district court's restitution order under the Act must be limited to "the losses to the victim *caused by the offense*." *Llamas*, 599 F.3d at 391 (quoting *United States v. Newsome*, 322 F.3d 328, 341 (4th Cir. 2003)).

---

[13] Elbaz asks that we follow *United States v. Azeem*, 946 F.2d 13, 16 (2d Cir. 1991), which held that drug trafficking in Egypt "should not have been included in the base offense level calculation because it was not a crime against the United States."  But *Azeem* based this blanket prohibition on an inference from the Guidelines' exclusion of foreign convictions.  We understand the exclusion of foreign convictions, but not foreign conduct, to be a specific limitation on the general principle that there should be no limitation on the information considered.  And this specific and narrowly limited exclusion confirms that foreign conduct may be considered elsewhere. *See United States v. Hawley*, 919 F.3d 252, 256–57 (4th Cir. 2019) (applying the *expressio unius* canon to the Guidelines).

The substantive wire-fraud counts cannot support restitution for foreign losses. Those counts involved individual U.S. victims. So only those domestic victims can receive restitution under the Act for the substantive counts.

Nor can the conspiracy count justify restitution under the Act for losses stemming from a purely extraterritorial conspiracy. The court can impose restitution under the Act for the separate conspiracy offense. *Llamas*, 599 F.3d at 390–91; *see also Newsome*, 322 F.3d at 341; *United States v. Seignious*, 757 F.3d 155, 161 (4th Cir. 2014). But the presumption against extraterritorial application applies to provisions, like the Act, that provide remedies just as it does to substantive prohibitions. *See WesternGeco*, 138 S. Ct. at 2137–39. This Act does not explicitly rebut the presumption, so we must identify the Act's focus to ensure we apply it only domestically.

When determining the Act's focus, we consider how it "works in tandem with other provisions," *id.* at 2137, namely the offenses included by the Act. For these offenses, the Act provides more punishment and reimburses victims of those offenses. *See Pasquantino* 544 U.S. at 365 (noting restitution has both compensatory and punitive purposes). So we conclude that the Act's "focus" is that of the underlying offense—the wire-fraud conspiracy.

As we discussed earlier, the focus of the wire-fraud conspiracy tracks the focus of its own underlying offense. Recall that § 1349 applies to one who conspires only "to commit any offense" under the chapter of the U.S. Code containing wire fraud. And the U.S. Code only criminalizes *domestic* wire fraud. That means purely foreign conduct that would otherwise amount to "wire fraud" is not a crime under the U.S. Code. So any alleged

23

"object" of the conspiracy that lacks a domestic nexus is not an "offense" under the U.S. Code, and an agreement to commit a non-criminal object is no conspiracy offense at all. *See supra* n.5. So a conspiracy with foreign "wire fraud" as its object cannot justify imposing restitution.[14]

We thus find the inclusion of those foreign victims with no nexus to criminal conduct in the United States in the restitution calculation was an error and remand for recalculation.

### 3.    The Supervised Release Conditions Were Proper

Elbaz also challenges certain supervised release conditions imposed at sentencing. The district court imposed three years of supervised release, orally announcing the terms were subject to "the standard and statutory conditions of supervised release" along with "additional conditions."[15] J.A. 6727. The additional conditions were read aloud. Those conditions were also in the probation officer's sentencing recommendation and detailed in the written judgment. Elbaz never objected to the "the standard and statutory conditions of supervised release" or any of the additional conditions.

---

[14] The restitution is not limited to the victims of the three substantive wire-fraud offenses charged. It also extends to those victims who were "directly [or] proximately harmed" by a conspiracy to misuse domestic wires. § 3663A(a)(2).

[15] The additional conditions include financial disclosures, a bar on incurring new credit charges or lines of credit without the approval of the probation officer, a bar on engaging in "an occupation, business, profession or volunteer activity that would require or enable you to have access to financial information of others" without the probation officer's approval, a bar on violating immigration laws, and a bar on contacting victims of her crime without the probation officer's approval. J.A. 6728, 6773.

Elbaz first argues that the district court did not sufficiently specify "the standard and statutory conditions" of supervised release by merely orally incorporating them. But because Elbaz failed to raise this claim below, we review it only for plain error. *United States v. McMiller*, 954 F.3d 670, 675 (4th Cir. 2020) ("Because McMiller did not object to these [supervised release] conditions at the time of his sentencing, we again apply plain error review.").[16] And we find no plain error. A district court must orally pronounce discretionary conditions. *United States v. Rogers*, 961 F.3d 291, 296 (4th Cir. 2020). But the district court may satisfy this obligation "through incorporation—by incorporating, for instance, all Guidelines 'standard' conditions." *Id.* So the only question was whether this was a clear enough incorporation. While Elbaz raises a few possible alternative meanings of "standard and statutory conditions," the Guidelines conditions are the most obvious meaning in context. So even if it would not have been clear enough to survive de novo

---

[16] Elbaz argues that her objection to the length of imprisonment preserves any challenge to the terms of supervised release. But the general principle is that objections must be made "with sufficient specificity so as reasonably to alert the district court of the true ground for the objection." *United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007). So Elbaz's objections to her term of imprisonment are not specific enough to preserve a challenge to the terms of supervised release. Elbaz cites *United States v. Ross*, 912 F.3d 740, 746 n.2 (4th Cir. 2019), to argue "[r]ecent circuit precedent suggests" preserving a challenge to any portion of the sentence preserves a challenge to the terms of supervised release. But the *Ross* footnote was dicta, not a holding. And *Ross* was wrong to conflate the mootness considerations at issue in *United States v. Ketter*, 908 F.3d 61, 65–66 (4th Cir. 2018), with the more specific requirements necessary to preserve a legal claim. So we continue to follow our longstanding specificity requirement. *See also United States v. Boyd*, 5 F.4th 550, 556 (4th Cir. 2021) (analyzing standard of review on a condition-by-condition basis).

It is also true that "we review the consistency of [a defendant's] oral sentence and the written judgment de novo." *United States v. Rogers*, 961 F.3d 291, 296 (4th Cir. 2020). But here, the issue is not consistency. The question is whether the conditions were incorporated clearly enough, so plain-error review applies.

review, the district court's incorporation of the standard conditions here was not plainly erroneous.

Elbaz also argues that the court erred in failing to provide an adequate explanation for the additional conditions imposed. As mentioned above, Elbaz failed to object to the supervised release conditions, much less object on this basis. Thus, we review only for plain error. *McMiller*, 954 F.3d at 675. And on appeal, Elbaz generally alleges that the explanation was insufficient but presents arguments on only two financial conditions that require Elbaz to get the approval of her probation officer before (1) "incur[ring] any new credit charges or opening lines of credit" or (2) "engag[ing] in [work] or volunteer activity that would require [her] or enable [her] to have access to financial information of others." J.A. 6728. So we consider only those conditions. *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999) (holding that appellant must list both "contentions and the reasons for them" to avoid abandoning arguments).

Supervised release conditions only need to be "'reasonably related' to statutory factors referred to in § 3583(d)(1)." *United States v. Dotson*, 324 F.3d 256, 260 (4th Cir. 2003). And the court also has a duty to explain the conditions of release. *See United States v. Arbaugh*, 951 F.3d 167, 178 (4th Cir. 2020) ("Just as with other parts of a sentence, the district court must adequately explain any special conditions of supervised release."). But where "a special condition is so unobtrusive, or the reason for it so self-evident and unassailable," remand may be unnecessary under plain-error review. *McMiller*, 954 F.3d at 677.

Elbaz contends that the court failed to explain why the limits on credit or access to others' financial information were appropriate in Elbaz's circumstances. But the court thoroughly discussed the financial nature of her crimes (along with adopting the detailed presentence report). And it is obvious from the face of the record that these restrictions were motivated by a desire to protect against Elbaz's future capacity to commit similar financial fraud. And that is enough to "permit meaningful appellate review of [her] supervised release conditions" given these circumstances. *Id.* Under these circumstances, the reason for imposing the conditions is so "self-evident and unassailable" that the district court's failure to expressly explain each of them did not "seriously affect[] the fairness, integrity, or public reputation" of the sentencing proceedings. *See id.* (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

Finally, Elbaz argues that the conditions impermissibly delegate authority to a probation officer, because she "must not incur new credit charges or open additional lines of credit without the approval of the probation officer" and "must not engage in an occupation, business, profession or volunteer activity that would require or enable [her] to have access to financial information of others without the prior approval of the probation officer." J.A. 6773. While probation officers cannot be given "completely unguided discretion," discretion tends to be more acceptable when it is cabined to narrow conditions, not plagued by "overbreadth and vagueness." *United States v. Hamilton*, 986 F.3d 413, 420 (4th Cir. 2021). It is permissible to give "probation officers a significant measure of discretion" which can "vest some interpretive role in the officer . . . . There simply need to be some general parameters set on that discretion related to the record in this case." *Id.*

27

at 420; *see also United States v. Comer*, 5 F.4th 535, 547–48 (4th Cir. 2021) (rejecting a non-delegation challenge to a condition that the defendant not maintain a social media account without approval of a probation officer).  Here, the sort of discretion given to the probation officer relates to the main harm of this case:  Elbaz's abuse of financial trust.  And the restrictions are narrow, involving the use of credit and being in a position to obtain others' financial information.  So the district court did not plainly err in imposing these conditions.

*          *          *

Elbaz hatched a massive fraudulent scheme that targeted victims in the United States using wires in the United States.  Even though we agree that the wire-fraud statute does not apply extraterritorially, its focus is the misuse of wires in the United States for fraudulent purposes, so Elbaz was convicted of the domestic act of using wires in the United States.  The district court did not err in refusing to impose the extraordinary remedy of granting use immunity to witnesses, and the court sufficiently cleansed the proceeding of any prejudice caused by the juror who overheard outside discussion of the defendant.  Based on the text of the Guidelines, the district court properly considered Elbaz's extraterritorial conduct and harm in sentencing.  But the district court too broadly imposed restitution, so we must remand for a new restitution order.  Finally, the court did not plainly err when imposing supervised release conditions, and the conditions were both reasonable and constitutional.  The conviction and sentence are therefore affirmed except for the restitution order.

AFFIRMED IN PART,

28

29

VACATED IN PART,
AND REMANDED